AMERICAN UNIVERSITY PARK
CITIZENS ASSOCIATION, et
al., Appellants,

v.

David BURKA et al., Appellees.

No. 12597.

District of Columbia Court of Appeals.

Argued May 10, 1978.

Decided March 20, 1979.

738

Frank M. Northam, Washington, D. C., with whom William J. Butler, Jr., and Mitchell W. Dale, Washington, D. C., were on the brief, for appellants.

Norman M. Glasgow, Washington, D. C., with whom John F. McCabe, Jr., and J. E. Bindeman, Washington, D. C., were on the brief, for appellees David and Fred Burka.

Louis P. Robbins, Principal Deputy Corp. Counsel, with whom John C. Salyer III and Edward L. Curry, Asst. Corp. Counsels, Washington, D. C., were on the brief, for appellees Dist. of Columbia Surveyor, Dist. of Columbia Dept. of Economic Development, and Dist. of Columbia Zoning Commission.

Before NEWMAN, Chief Judge, and MACK and FERREN, Associate Judges.

FERREN, Associate Judge:

In late 1976, three citizen associations and four neighborhood residents (appellants) filed suit to enjoin the issuance of a building permit to David and Fred Burka, who intended to construct a 194,420 square foot building for retail stores and offices on Massachusetts Avenue between 48th and 49th Streets, N.W.[1] Appellants argued that a structure of that size was premised on the unlawful closing of an alley in 1973, facilitating the combination of five lots into one and, as a result, permitting construction of a larger building than the previous, smaller lots could lawfully accommodate.

Appellants, more specifically, urged the trial court to set aside the alley closing, enjoin the building permit, and restrain construction for the following reasons now advanced on appeal: (1) the National Capital Planning Commission (NCPC) and the District of Columbia Council did not make findings, required by the Street Readjustment Act, D.C.Code 1973, §§ 7–401, –403, that the alley was "useless or unnecessary," and that its closing would be "in the public interest" and not "detrimental" to the rights of abutting property owners; (2) NCPC's consideration of the matter was void in any event for conflict of interest, because the chairman of the NCPC Transportation Committee, which recommended the alley closing, was also the architect for the property owners who sought the closing; (3) NCPC and the Council had approved the alley closing based on a representation—now a misrepresentation—that the applicants would construct a 95,822 square foot building, not one over twice as large; (4) even if the alley closing complied in all respects with the statute, the Burkas' use of that closing to "borrow" floor area ratio (FAR) from one lot for a larger building on another lot would be an unlawful circumvention of the zoning process; and (5) the planned structure would violate the Home Rule Act because it would not be

1. The plaintiff-appellants are The American University Park Citizens Association, the Committee of 100 on the Federal City, the Spring Valley-Wesley Heights Citizens Association, Peter L. and Judith M. Findlay, and Stephen A. and Sally M. Herman.

consistent with the Comprehensive Plan for the National Capital.[2]

After a hearing, the motions judge granted summary judgment for the Burkas. He held that appellants were barred by laches from challenging the alley closing on the first two grounds, and that their other three arguments must fail on the merits. We affirm these rulings.

## I.

On October 14, 1972, counsel for Kogod & Burka Enterprises, Inc., then owners of the property at issue in this case, wrote the Surveyor of the District of Columbia requesting amendment of an earlier application to close the public alley separating Lots 2, 3, 4, and 5 from Lot 7 in Square 1499 (Massachusetts Avenue between 48th and 49th Streets, N.W.). Counsel stated that the purpose of the closing was to facilitate the merger of Lot 7 with the other four lots, in order to permit construction of a larger building on Lots 2, 3, 4, and 5 than the District of Columbia Zoning regulations otherwise would permit. This could be accomplished, in effect, by "borrowing" additional FAR from Lot 7 for use on the other lots.

In accordance with the Street Readjustment Act, D.C.Code 1973, § 7–401, the application was referred to NCPC for its recommendation. The preliminary plans submitted by Kogod & Burka's architect to the NCPC Transportation Committee indicated that the new building would have a floor area of 95,822 square feet. The existing C–2–A zoning would permit only 75,386 square feet of floor area in a structure built on Lots 2, 3, 4, and 5; thus, the proposed alley closing was intended at the time to facilitate, in effect, the transfer of 20,436 square feet from Lot 7 (or approximately

15% of the total floor area available from Lot 7). On March 1, 1973, NCPC, acting on a favorable committee report, recommended approval to the District of Columbia Council.

After a public hearing on March 26, 1973, the Council adopted a resolution on April 17 ordering that the requested portion of the alley be closed, subject to a deed of easement for vehicular and pedestrian access. Thereafter, the Council published notice of the closing for 14 consecutive days, stating that it would become effective on May 21, 1973 "if no objection in writing is made by any party interested prior to that date." The appellant organizations filed letters of objection. The Council did not rescind. On May 21, 1973, the Surveyor recorded the plat reflecting the transfer of the closed portion of the alley to the adjoining property owners, Kogod & Burka Enterprises, Inc. See Carr v. District of Columbia, 312 F.Supp. 283 (D.C.D.C.1970), aff'd without opinion, (D.C.Cir., No. 24,406, Sept. 28, 1971). As a result of amendments to the zoning regulations adopted by the Zoning Commission on May 21, 1973, effective May 29, 1973, the closed portion of the alley received the same (C–2–A) zoning as the contiguous property, without the necessity of a public hearing.[3]

Three years later, on August 4, 1976, David and Fred Burka, who by then owned the property, requested the Surveyor to combine Lots 2, 3, 4, 5, and 7 into a single lot. See D.C.Code 1973, § 1–618.[4] On September 28, 1976, the Surveyor combined them into Lot 9. Meanwhile, on September 22, 1976, the Burkas had filed with the Department of Economic Development an application for a building permit for a structure with a floor area of 194,420

---

**2.** Appellants also presented several other arguments which the trial court rejected and have not been reiterated on appeal.

**3.** Appellants have not appealed Judge Ugast's rejection of their original position that the May 29, 1973 amendments could not validly be applied to alleys which had been closed but unzoned as of that date.

**4.** The Burkas had acquired ownership of the property from Kogod & Burka Enterprises, Inc. in 1975 as the result of a lawsuit which Fred Burka and other stockholders had brought to dissolve that corporation, in order to resolve an internal dispute over future development of the property. The dissolution led to an exchange of various District of Columbia landholdings among the stockholders.

square feet—a structure consistent with C–2–A zoning of the new lot but over twice as large as the one reflected in the preliminary plans at the time of the 1973 alley closing. On December 30, 1976, the Department issued the requested permit.[5]

On November 24, 1976, appellants filed a Complaint for Injunction and Declaratory Judgment to invalidate the alley closing and prevent the planned structure, as well as a Motion for Preliminary Injunction to enjoin issuance of the building permit and construction pending resolution of the suit. After the parties had filed motions for summary judgment (and/or to dismiss), the court consolidated the application for preliminary injunction with the motions, *see* Super.Ct.Civ.R. 65(a)(2), and set them for hearing on April 15, 1977.

In a Memorandum Opinion of June 23, 1977, Judge Ugast ruled, first, that although the statute of limitations, D.C.Code 1973, § 12–301, was inapplicable in light of the equitable nature of the relief sought, appellants nevertheless were barred by laches from pursuing the two arguments based solely on the alleged illegality of the 1973 alley closing—specifically, the assertions that the alley closing was not accomplished in accordance with the Street Readjustment Act, and that the closing should be declared void because of the NCPC Transportation Committee Chairman's conflict of interest.[6] Judge Ugast then rejected appellants' additional claims that the alley closing should be voided because it had been premised on construction of a 95,822 square foot building, that the Burkas' plans unlawfully would circumvent the zoning

process, and that the project would violate the Comprehensive Plan. On July 1, 1977, in accordance with his opinion, Judge Ugast issued the Order and Judgment underlying this appeal.

## II.

We consider, first, Judge Ugast's ruling that laches barred appellants' 1976 challenge to the closing of the alley in 1973. Laches is the principle that "equity will not aid a plaintiff whose unexcused delay, if the suit were allowed, would be prejudicial to the defendant." *Russell v. Todd*, 309 U.S. 280, 287, 60 S.Ct. 527, 531, 84 L.Ed. 754 (1940). It was developed to promote diligence and accordingly to prevent the enforcement of stale claims. *Powell v. Zuckert*, 125 U.S.App.D.C. 55, 57, 366 F.2d 634, 636 (1966); *see Brundage v. United States*, 504 F.2d 1382, 1384 (Ct.Cl.1974), *cert. denied*, 421 U.S. 998, 95 S.Ct. 2395, 44 L.Ed.2d 665 (1975). Laches will not provide a valid defense, however, unless two tests are met: the defendant has been prejudiced by delay and that delay was unreasonable. *See Wieck v. District of Columbia Board of Zoning Adjustment*, D.C.App., 383 A.2d 7, 11 (1978); *Amidon v. Amidon*, D.C.App., 280 A.2d 82, 84 (1971); *Duncan v. Summerfield*, 102 U.S.App.D.C. 185, 186, 251 F.2d 896, 897 (1957). In the absence of an analogous statute of limitations, the party asserting the defense has the burden of establishing both elements. *See Kosty v. Lewis*, 115 U.S.App.D.C. 343, 349 n.8, 319 F.2d 744, 750 n.8 (1963), *cert. denied*, 375 U.S. 964, 84 S.Ct. 482, 11 L.Ed.2d 414 (1964).[7]

---

5. Neither the Department of Economic Development nor any other agency referred the permit application to any Advisory Neighborhood Commission (ANC) for comment. Judge Ugast ruled that the failure to give notice to any affected ANC was harmless even though it may have violated § 738(d) of the District of Columbia Self-Government and Governmental Reorganization Act, D.C.Code 1978 Supp., § 1–171(d) and § 13(c) of the Duties and Responsibilities of the Advisory Neighborhood Commissions Act of 1975, D.C.Code 1978 Supp., § 1–171i(c). It was undisputed that Commissioners of ANC 3D and ANC 3E had actual notice of the application soon after it was filed on Sep-

tember 22, 1976. *See Kopff v. District of Columbia Alcoholic Bev. Control Bd.*, D.C.App., 381 A.2d 1372, 1381–82 (1977). This ruling has not been appealed.

6. Judge Ugast indicated that even if laches did not bar the two claims, he would have rejected them on their merits. We express no view on these matters.

7. Appellees have not argued in this court, as they did before Judge Ugast, that a statute of limitations applies. Nor have appellees questioned Judge Ugast's ruling that there is no analogous statute of limitations, thereby placing the burden to prove laches on them.

As the parties' supplemental briefs indicate, determining the appropriate standard of review of a trial court ruling as to laches presents a complex question—one with no consistent pattern of answers. Some courts have held that laches essentially is a question of fact, limiting appellate review to the "clearly erroneous" standard of Super.Ct. Civ.R. 52.[8] Other courts have perceived laches as a mixed question of fact and law,[9] or as a conclusion of law,[10] permitting much freer, sometimes de novo, appellate review.

■ We conclude that the determination is a mixed question of fact and law in this sense: answers to the factual questions bearing on prejudice to the defendant from delay and on the plaintiffs' earlier awareness of the claim are for the trial court, whose findings will be accepted unless "clearly erroneous." Super.Ct.Civ.R. 52; see *Churma v. United States Steel Corp.*, 514 F.2d 589, 593 (3d Cir. 1975); D.C.Code 1973, § 17–305(a). Whether the facts, taken together, are sufficient to sustain the defense of laches, however, is a question of law which the appellate court will review without need for deference to the trial court's judgment. *See Churma, supra* at 593; D.C.Code 1973, § 17–305(a); Wright & Miller, Federal Practice and Procedure, Civil, § 2588, at 750–53 (1971).

We turn first, therefore, to Judge Ugast's factual findings on the two elements of laches—prejudice and unreasonableness of delay. As to prejudice, the Burkas assert that they have undertaken substantial legal and financial commitments since the alley closing in May 1973 and, more particularly, since June 1975 when, as a result of a lawsuit, they became owners of the property. *See* note 4 *supra*. Judge Ugast specifi-

cally found that the Burkas had undertaken the following commitments, among others: "the vacation of the property's former tenants over the period of years, resulting in a large reduction of income; the series of contractual obligations entered into, particularly with the architect, Mr. Dreyfuss; the money expended for the building permit; the financial commitments made with the American Security Bank; and, the legal fees incurred in the development of the subject property." Judge Ugast found, in addition, that if the court were to permit appellants to tie the project up longer by asserting their claims in late 1976, this "would almost definitely increase the costs to [the Burkas] with respect to the mortgaging of the property and the actual construction of the building." Finally, Judge Ugast acknowledged that "the Burkas would have incurred many of these same expenses should they [have] decide[d] to build a smaller building" (as indicated in Kogod & Burka's preliminary plans for a 95,822 square foot structure); but he also found that all the expenses since at least June 1975 had been premised on plans to construct a 194,420 square foot building and would, in many instances, be rendered fruitless if the Burkas' intentions could not be executed.

We agree that the evidence of record supports Judge Ugast's findings; the Burkas would be substantially prejudiced if appellants were permitted to challenge the 1973 alley closing by a lawsuit three years later.

■ To prevail, however, the Burkas also must show that appellants' delay was undue, unexplained, and inexcusable. *See Abraham v. Ordway*, 158 U.S. 416, 420, 15

---

8. *See Esso Int'l, Inc. v. S. S. Captain John*, 443 F.2d 1144, 1150 (5th Cir. 1971); *Central Ry. Signal Co. v. Longden*, 194 F.2d 310, 320 (7th Cir. 1952); *In re Consolidated Pretrial Proceedings In Air West Securities Litigation*, 436 F.Supp. 1281, 1290 (N.D.Cal.1977); *California State Auto. Ass'n v. Cohen*, 44 Cal.App.3d 387, 393, 118 Cal.Rptr. 890, 893 (1975); *Wilson v. King of Prussia Enterprises, Inc.*, 422 Pa. 128, 133, 221 A.2d 123, 126 (1966).

9. *See Churma v. United States Steel Corp.*, 514 F.2d 589, 592–93 (3d Cir. 1975); *First Nat'l Bank v. Roeland Park State Bank & Trust Co.*, 357 F.Supp. 708, 712 (D.Kan.1973); *McNulty v. Lloyd*, 149 Cal.App.2d 7, 11, 307 P.2d 706, 708 (1957); *Mahar v. Goodspeed*, 30 Cal.App.2d 391, 394, 86 P.2d 382, 384 (1939); *Freeman v. Martin Robowash, Inc.*, 61 Tenn.App. 677, 689, 457 S.W.2d 606, 611 (1970).

10. *See Skeen v. Van Sickle*, 80 Utah 419, 425, 15 P.2d 344, 346 (1932).

S.Ct. 894, 39 L.Ed. 1036 (1895); *Major v. Shaver*, 88 U.S.App.D.C. 148, 149, 187 F.2d 211, 212 (1951) (per curiam); *Mount Vernon Savings Bank v. Wardman*, 84 U.S.App.D.C. 343, 344, 173 F.2d 648, 649 (1949); *Lasseigne v. Nigerian Gulf Oil Co.*, 397 F.Supp. 465, 473 (D.Del.1975); *Szuch v. Lewis*, 193 F.Supp. 831, 835 (D.D.C.1960). More specifically, in order to invoke laches successfully, one must premise the defense on the fact "that the party to whom laches is imputed has knowledge of his rights, and an ample opportunity to establish them in the proper forum; that by reason of his delay the adverse party has good reason to believe that the alleged rights are worthless, or have been abandoned." *Galliher v. Cadwell*, 145 U.S. 368, 372, 12 S.Ct. 873, 874, 36 L.Ed. 738 (1892); *Concerned About Trident v. Schlesinger*, 400 F.Supp. 454, 478 (D.D.C. 1975), *rev'd on other grounds*, 180 U.S.App. D.C. 345, 555 F.2d 817 (1977).

Appellants do not deny that they have been aware of the alleged irregularities in the alley closing since 1973. In fact, two of the three appellant organizations petitioned for direct review of the alley closing by this court. *American University Park Citizens Association v. District of Columbia Council*, No. 7563 (dismissed August 6, 1973).[11] Appellants base their argument, rather, on this court's decision in *Chevy Chase Citizens Association v. District of Columbia Council*, D.C.App., 327 A.2d 310, 316 (1974) (en banc) that the Council's action closing a portion of a street under the Act did not create a "contested case" (permitting relief by way

of direct appeal to this court).[12] From this it follows, appellants say, that the alley closing did not trigger a right to relief which they now can be charged with failing, inexcusably, to exercise in timely fashion. They maintain, instead, that a justiciable controversy—a right to relief—did not accrue until September 1976, when the Burkas requested the Surveyor to combine the lots and then applied for a building permit.

Contrary to appellants' suggestion, our holding in *Chevy Chase Citizens Association, supra* that a street closing did not create a "contested case," directly reviewable by this court, is not determinative. That decision did not foreclose the possibility that a street closing creates a justiciable controversy, cognizable in Superior Court. The question, therefore, is whether appellants should be held accountable, by way of laches, for failing to perceive a responsibility to file a Superior Court action substantially earlier than they did.

The central concern here is not the availability of a Superior Court forum. It is true that this court's division opinion in *Chevy Chase Citizens Association*, D.C.App., 307 A.2d 740 (1973), held that a street closing can be a "contested case," subject to direct review by this court, and that appellants, as a result, reasonably could have believed that this court was the only place to seek relief. Only two months later, however, on August 27, 1973, we vacated that opinion, 309 A.2d 97, and calendared it for rehearing en banc, thereby signaling that a

---

11. The record also indicates that on April 17, 1973, the President of the American University Park Citizens Association wrote the Chairman of the District of Columbia Council's Transportation Committee, Rev. Jerry A. Moore, questioning the need to close the alley and expressing the view that it should remain open. On April 19, 1973, and again on April 30, 1973, the Committee of 100 on the Federal City wrote the Council protesting the closing of the alley and its transfer to Kogod & Burka Enterprises, Inc. The letter stated: "The ground for our objection is that the Council's action was unlawful and in excess of its jurisdiction under the Street Readjustment Act of the District of Columbia," and went on to ask that Council action on the alley closing in Square 1499 be held in abeyance until the District of Columbia

Court of Appeals had disposed of a pending challenge under the provisions of the District of Columbia Administrative Procedure Act against an earlier alley closing. *See Chevy Chase Cit. Ass'n v. District of Columbia Council*, D.C.App., 327 A.2d 310 (1974) (en banc).

12. The District of Columbia Administrative Procedure Act, D.C.Code 1978 Supp., § 1–1510, provides in part:

Any person suffering a legal wrong, or adversely affected or aggrieved, by an order or decision of the Mayor or an agency in a contested case, is entitled to a judicial review thereof in accordance with this subchapter upon filing in the District of Columbia Court of Appeals a written petition for review.

majority of this court had serious reservations about the holding. Thereafter, on October 22, 1974, almost two years before appellants filed the present lawsuit, we not only rejected the division's view but expressly confirmed "that the Council's decision to close a street is not unreviewable. An action seeking equitable relief may be brought in the Superior Court." 327 A.2d at 317 n.18 (citations omitted). Although this statement was conclusional, not analytic, it was enough to put appellants on notice that their complaint about the alley closing as such, see note 11 supra, was ripe for litigation.

We acknowledge, however, that the Chevy Chase Citizens Association footnote is not dispositive of the laches issue, for although it suggested a forum, it did not come to grips with the crux of the justiciability question: upon the closing of a street or alley, is there a justiciable controversy at that time as to any potential use to which the combined lots can be put; or does justiciability depend, instead, on whether a developer has advanced concrete plans, knowable to potential opponents—or even depend, as appellants argue, upon a developer's later request for governmental action, such as issuance of a building permit, which manifests that development assuredly is about to happen?

Because laches is an equitable principle we should not attempt to draw a bright line here; it would be imprudent (if not a contradiction) in effect to create, on one set of facts, an equitable statute of limitations. We therefore have to evaluate, strictly on the record, two colorable, competing arguments.

The Burkas argue that the manifest purpose of the alley closing was to facilitate construction of a larger building than would otherwise be permitted; that in connection with its application to close the alley, Kogod & Burka Enterprises, Inc. disclosed preliminary plans to construct a building with 95,822 square feet of floor area; that appellants were aware of these plans at the time; that the legal basis for their challenge to the alley closing was as

available in 1973, when the 95,822 square foot structure was proffered, as it was in 1976 when the Burkas, as new owners, revealed plans for a 194,420 square foot structure; that in 1973 the Council might have, but did not, condition the alley closing on construction of a building of a limited size, such as the one contained in the preliminary plans; and that appellants, therefore, were on notice since 1973 that the owners of the property, once the alley was closed, not only were going to develop it on a combined lot basis but were legally entitled to—and indeed might—do so to the maximum extent possible.

Appellants counter by arguing that until a developer's plans are complete, as evidenced by application for a building permit, any lawsuit would be premised on pure speculation as to development; that the change of ownership and building plans in the present case is clear evidence of the prematurity of suing earlier to enjoin a "hypothetical threat"; that until the size of the building actually to be constructed is known, the impact on air quality, traffic congestion, and community atmosphere attributable to the alley closing—the impact determining whether a suit should be brought—cannot be known; and that the present suit, therefore, was not ripe for adjudication until September 1976, when appellees combined the lots and applied for a permit.

Viewing the record, as we must, in the light most favorable to appellants, see Burch v. Amsterdam Corp., D.C.App., 366 A.2d 1079, 1081 (1976), we conclude, nevertheless, that in two respects their argument is flawed. First, the legal basis for their challenge to the alley closing in no way varies with the size of the structure to be built on the combined lots; the legality of the Council's action in 1973 is not affected by later plans for a 194,420 square foot building instead of a facility, as originally planned, covering 95,822 square feet. More specifically, while air quality, traffic, and other studies may reveal that a building twice the size of the one originally planned would make a substantially greater adverse

impact than the smaller building, such empirical data does not contribute to appellants' fundamental, legal arguments that the Council exceeded its authority in closing the alley and that the NCPC recommendation suffered from a conflict of interest. It is relevant only to appellants' misrepresentation argument. *See* Part III *infra.*

Second, appellants cannot seriously argue that their opposition to the alley closing, as such, resulted from the second proposed building but not the first. From the beginning they were on record in opposition to the closing, even to accommodate a 95,822 square foot building, as evidenced by their petition for review asking this court to upset the Council action. *See generally* note 11 *supra.*

Finally, the alley closing did not signal a mere "hypothetical threat." It may be true, if rare, that land is sometimes assembled, even within a large city, without a view to development. But on the facts here, one could not reasonably conclude that development of the property after closing of the alley was a "mere possibility." False starts there were—and often are; but the owner's significant efforts here to clear the way for development, by seeking to close the alley in order to construct an extra-large building, were obvious signals to those in the area who learned about them in 1973. Potential opponents should not ordinarily be permitted to ignore such signals—to wait until a developer has obtained zoning, architectural plans, financing, and/or other costly prerequisites to a build-

ing permit—and then claim the right, at the last minute, to sue, here three years later.[13]

■ There may be circumstances where a developer's plans for property are so unspecific or tentative, or opponents with standing to complain are so in the dark, that laches would not bar a suit brought considerably after a street or alley closing. But this is not such a case. In 1973, the owner had specific plans and took specific, public action by way of an alley closing to achieve them. Appellants immediately took steps to oppose by appealing the alley closing to this court, without a corresponding, protective lawsuit in Superior Court, even though they were on notice as early as August 27, 1973 (when we vacated the division opinion in *Chevy Chase Citizens Association, supra* ) that the right to direct appeal here was an open, difficult question. Even when we announced that the Superior Court was the proper forum, in October 1974, appellants held off suing for two more years. And there is no basis for a contention that the Burkas' eventual plans for a building twice as large as the one previously contemplated had any bearing on appellants' fundamental claim that the alley closing was illegal, or on their opposition to substantial development of the property—which had been evident for at least three years. Appellants cannot use the Burkas' revised plans—an incremental worsening of the situation—to say that appellants either failed to see, or could not come to grips with, the problem in 1973.[14]

**13.** The cases cited by appellants are inapposite, for unlike the instant case they do not concern situations in which the owner had a present intention, coupled with active steps visible in the community, to develop the property. For example, in *West v. Bank of Commerce & Trusts,* 153 F.2d 566 (4th Cir. 1946), the circuit court of appeals reversed summary judgment for plaintiffs, who had sought a declaratory judgment that their property could be used for business purposes. The appellate court found no "actual controversy," since "[t]he complaint contained no allegation that the owners desired or were about to use the property for a gasoline station or other business purpose." *Id.* at 568. The fact that the owners had not applied for a building permit was supplementary evidence of no present intention to build, but the court in

no way intimated that application for a building permit was a prerequisite to a justiciable controversy. Similarly, in *McLarty v. Borough of Ramsey,* 166 F.Supp. 291, 294 (D.N.J.1958), *aff'd,* 270 F.2d 232 (3d Cir. 1959), the district judge, citing *West, supra,* pointed out that "[i]n essence [plaintiffs] desire to know whether, if and when the opportunity offers itself, they will be free to use or sell their lots for the purposes permitted in the 'C–2' zone." The circuit court of appeals affirmed on grounds of mootness, failure to exhaust administrative remedies, and abstention.

**14.** Appellants in their briefs repeatedly make statements such as: "In 1973, neither the citizenry nor the NCPC and D.C. Council understood or could understand the real impact of

■ We conclude, accordingly, that the delay between the 1973 alley closing and appellants' 1976 lawsuit severely prejudiced the Burkas, and that the delay was inexcusable. We affirm Judge Ugast's holding that appellants' challenges to the alley closing—their claims that the Council did not make the required findings and that the favorable NCPC recommendation was infected by conflict of interest—are barred by laches.

### III.

■ Appellants' other three arguments are not subject to laches, for they depend not only on the alley closing but also on the size of the building for which the permit was issued in December 1976.[15] Thus, appellants next seek revocation of the building permit on the ground that the NCPC recommendation and the Council's favorable action in 1973 were premised on the 95,822 square foot building described in the applicant's "preliminary plans"—that the action left no room for issuance of a permit in 1976 to build one twice as large.[16]

We have noted that the Council must consider the effect of the alley closing on "such matters as traffic flow, transportation facilities, population density, and proper mixture of housing, commercial facilities, schools, and parks." *Chevy Chase Citizens Association*, 327 A.2d at 316. From this record we must assume, as appellants maintain, that the Council (and NCPC before it) based such consideration on anticipation of a structure half the size of the one for which a building permit eventually was issued.

Like the trial court, however, we find no misrepresentation by Kogod & Burka Enterprises, Inc. (the Burkas' predecessor in interest), let alone by the Burkas. The plans accompanying the application for alley closing were never represented to be more than "preliminary." Moreover, no one disputes the fact that the plans for the larger project were not drawn until after the 1975 lawsuit which led to dissolution of Kogod & Burka Enterprises, Inc., and passage of ownership to the Burkas. *See* note 4 *supra*. Finally, the Council was aware that its action could affect the development of the property in a manner which overlapped the concern of the zoning authorities. The Rev. Jerry Moore, chairman of the Council's Transportation Committee, reported:

> The basic purpose of this closing is to increase the lot size for purposes of computing allowable Floor-Area-Ratio. In this specific case there have been no objections and the proposed development is consistent with the land use objectives of the Comprehensive Plan. The Committee feels that the Zoning Commission should give careful consideration to the implications in the future of alley closings which would borrow at least some floor area from Lot 7."

the alley closing (and the proposed construction) upon such matters as traffic flow, transportation, population density, and proper mixture of housing, commercial facilities, schools, and parks (citation omitted)"; "the closing of the alley now threatens . . . in ways which simply were not, and could not have been, foreseen in 1973"; the alley closing "seemed at the time, to be an unhazardous legislative proceeding." In view of appellants' opposition to the alley closing in 1973, *see* note 11 *supra*, we believe that these quotations amount to obvious overstatement.

We agree with Judge Ugast: "based upon the record as a whole, it is safe to assume that [appellants] were aware that some structure would be built on this property and knew when the application for the alley closing was before the NCPC and the City Council that such building would be 60 feet in height and the owners

15. As Judge Ugast put it: "The fact that any claim based upon misleading information could only arise at the time of the application for the building permit, which is when the preliminary proposals could be compared to the ones finally submitted, takes this issue out of any discussion that it might have been barred by laches."

16. Although appellants seek to void the alley closing by virtue of this argument, our holding that a challenge to the alley closing, as such, is barred by laches means that this argument cannot accomplish such voidance. Appellants can only seek to stop a 195,420 square foot building instead of a 95,822 square foot building, which would be immune from challenge under this theory.

have a significant effect on allowable Floor-Area-Ratio.[17]

The Council, nevertheless, did not find reason to solicit the zoning authorities' views in this case; nor did it attempt to impose restrictions beyond the filing of an easement over the alley primarily for the benefit of nearby property owners. Possibly the Council questioned its authority to impose restrictions other than "reservations" of the sorts specified or clearly implied in the statute, see D.C.Code 1973, § 7–403—a legal issue we need not consider. In any event, although the Council may have premised its vote on the possibility of a 95,822 square foot building, we must accept Judge Ugast's finding that the Council knew it did not tie the owners down to particular plans for the property. Thus, we agree that the Council's action was not premised on misrepresentation.

### IV.

■ Appellants assert that even if the alley closing complied with the Street Readjustment Act, it unlawfully circumvented the zoning process by permitting the owners of combined Lot 9 to "borrow" FAR from the previous Lot 7, in order to increase the size of the structure to be built on former Lots 2, 3, 4, and 5 facing Massachusetts Avenue. More specifically, appellants contend, in effect, that the more onerous

zoning process should be held to preempt the Street Readjustment Act. An application to the Board of Zoning Adjustment (BZA) for a variance or special exception results in more effective public notice, a more comprehensive hearing procedure, and the use of more stringent substantive standards than are true for an alley closing. It follows, appellants say, that the zoning process is preeminent and must be followed here to achieve (if possible) a 195,420 square foot building on Lots 2, 3, 4, and 5.

There are several reasons why this argument has no merit. First, the Street Readjustment Act contains no provision which would subject the consequences of a street or alley closing to additional procedures under the zoning process. "The principal economic purpose of the Act was the savings that would be entailed in maintenance costs by virtue of the closings as well as the elimination of barriers to real estate development in the District." *Carr v. District of Columbia, supra* at 285–86. The legislative history indicates Congress anticipated that the statute would facilitate development of large public projects, as well as private and commercial properties.[18] The statute specifically permits closings which are "expedient or advisable" because of a "change in the highway plan," or to improve "access to the abutting or nearby property," or to facilitate government acquisition of abut-

17. Although objections apparently were not voiced at the Transportation Committee's public hearing on March 23, 1976, the appellant organizations made their opposition known within a month thereafter after publication of the notice of closing. *See* note 11 *supra*.

18. For many years, the single act of closing an alley or a street, for whatever purpose, required an act of Congress. *See Chevy Chase Citizens Ass'n,* 327 A.2d at 315. The inefficiency of this procedure was partially remedied by statute in 1924 and, more completely, in 1932 with congressional adoption of the Street Readjustment Act, Pub.L.No.72–307, 47 Stat. 747 (codified at D.C.Code 1973, §§ 7–401 to –410). Although the House Report emphasized the need to facilitate the development of large public projects, *see* H.Rep.No.1455, 72d Cong., 1st Sess. 2 (1932), testimony by the bill's proponents, included in the Senate Report, clearly indicated that undeveloped and underdeveloped streets and alleys were hindering efficient pri-

vate residential and commercial development as well. For example, the Director of Planning at the National Capital Park and Planning Commission (NCPPC) advocated adoption of the bill as a means of expediting "the closure or relocation of undeveloped or unnecessary streets, most of which do not now exist on the ground, but which complicate the economical development of school grounds, park areas, and other public properties, *as well as private property.*" Statement of Charles W. Eliot, II, S.Rep.No.688, 72d Cong., 1st Sess. 7 (1932) (emphasis added). Additionally, a member of the NCPPC related the Commission's frustration at being unable to persuade private developers to undertake the engineering expense of conforming their proposals to new or modified street plans because of the delay and uncertainty involved in obtaining congressional approval of those changes. *See* Statement of J. C. Nichols, *id.* at 6.

ting property "for school, park, playground, or other public purposes," or *"for other public reasons."* D.C.Code 1973, § 7–401 (emphasis added). Thus, an alley closing to facilitate land assemblage and development is consistent with the history and language of the statute.

Second, any division of property into lots is subject to change without formal action by the Zoning Commission or the Council. D.C.Code 1973, § 1–618, authorizes a proprietor to direct the Surveyor of the District of Columbia "to subdivide or alter boundaries, or change the surveys of any such tract or parcel of land." Similarly, D.C.Code 1973, § 1–620 authorizes any landowner to request the District of Columbia Surveyor to subdivide any square or lot "into convenient building lots or portions for sale and occupancy and alleys for their accommodation." *See Case v. Morrisette,* 155 U.S.App. D.C. 31, 40–41, 475 F.2d 1300, 1309–10 (1973). Thus, once the alley was closed, the Burkas had statutory authority to combine Lots 2, 3, 4, 5, and 7 into a single Lot 9, without leave of the zoning or other authorities, subject of course to the density and other development limitations inherent in the zoning category in which the newly drawn lot is located.

Given a property owner's unilateral right to change lot boundaries under § 1–618 and § 1–620, we perceive nothing special about the density limitations inherent in the earlier, multiple lot structure. The alley closing, coupled with the owners' statutory right to redraw lot lines, results in a license to do precisely what the Burkas did here.

Finally, the fact that there are two statutory routes to the same end does not necessarily imply that one of them must be deemed to preempt or limit the other. Congress could distribute authority to the District of Columbia Council and to the zoning authorities as it saw fit. *See Firemen's Insurance Co. v. Washington,* 157 U.S.App. D.C. 320, 325, 483 F.2d 1323, 1328 (1973) ("When Congress delegates its police power to the local government, that entity's powers become as broad as those of Congress, limited only by the Constitution or specific Congressional enactment.") Thus, Congress granted the Zoning Commission authority to regulate the use, area, and height of buildings; the BZA authority to grant variances and special exceptions; and the Board of Commissioners (and later the District of Columbia Council) authority to close streets and alleys. Nothing in the zoning statutes or elsewhere in the District of Columbia Code or other act of Congress can be said to subordinate street and alley closing to the zoning process. If the resulting distribution of authority leaves an undeniable lack of coordination, and even overlapping jurisdictions among the bodies whose decisions affect land use planning in the District of Columbia, the remedy must be sought through efforts at voluntary coordination, or ultimately from the legislature—not the courts.

## V.

Appellants point out, finally, that the Home Rule Act requires that zoning maps, regulations, and amendments "shall not be inconsistent with the comprehensive plan for the National Capital," D.C.Code 1978 Supp., § 5–414. They say that this refers to the comprehensive plan prepared by NCPC, commonly known as the "Red Book"; that the Burkas' proposed structure is not consistent with the "community shopping cluster" called for in the area by the Red Book; and that in any event it will not be a development of "medium proportions," as specifically required by zoning regulation § 5102.1 for the C–2–A zone.

Recently we have held that "the comprehensive plan for the National Capital" means "the plan to be adopted pursuant to § 203(a) of the Home Rule Act"—a plan that "has not been published." *Citizens Association of Georgetown v. Zoning Commission,* D.C.App., 392 A.2d 1027, 1034, 1035 (1978) (*Georgetown III*). We further held that until that plan is adopted, "compliance with the comprehensive plan provision of § 492(b)(1) of the Act requires solely that the Commission 'zone on a uniform and comprehensive basis.'" *Georgetown III, supra* at 1036 (quoting *Citizens Association*

of *Georgetown v. Zoning Commission,* 155 U.S.App.D.C. 233, 237–38, 477 F.2d 402, 406–07 (1973) (*Georgetown II*)).[19]

In applying this test we are satisfied, first, that the Burkas' proposed building complies with the C–2–A zoning for the area. Although zoning regulation § 5102.1 calls for development of "medium proportions," §§ 5201.1 and 5301.1 implicitly define that term by setting forth limitations which the Burkas' proposed development satisfies. We have no authority to ignore the Zoning Commission by devising a different "medium proportions" concept that would place the Burkas' property outside the plain requirements of the regulations.

Appellants have not directly challenged the C–2–A zoning category; they have challenged it only indirectly, *i. e.,* to the extent that it might permit development contrary to the comprehensive plan in the Red Book. Thus, appellants have never contended that C–2–A zoning, and with it

the Burkas' proposed building, violates the *Georgetown II, supra* test, that zoning shall be on a "uniform and comprehensive basis." Accordingly, because the Red Book is not the comprehensive plan and because appellants do not say that the proposed building will run afoul of the comprehensive plan requirement of *Georgetown II, supra* (confirmed in *Georgetown III, supra*), their argument fails.[20]

## VI.

For the reasons set forth above, appellants' first two arguments are barred by laches. The others fail on the merits.

*Affirmed.*

**19.** The first case in this series, commonly known as *Georgetown I,* is *Citizens Ass'n of Georgetown v. Washington,* D.C.App., 291 A.2d 699 (1972).

**20.** It is interesting to note that, contrary to appellants' contention, NCPC concluded (as did the Council) that the proposed structure would be consistent with the community shopping cluster called for in the area by the Red Book.