*Notice:* *This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 21-PR-0900

IN RE ESTATE OF ROSETTA JENKINS;
EDWARD JENKINS, APPELLANT.

Appeal from the Superior Court
of the District of Columbia
(2008-ADM-000016)

(Hon. Craig Iscoe, Petition Judge)

(Argued December 15, 2022                    Decided March 9, 2023)

*Francesca Ugolini* for appellant.

*Jonathan D. Leo* for appellee.

Before MCLEESE and HOWARD, *Associate Judges*, and THOMPSON, *Senior Judge*.

THOMPSON, *Senior Judge*: Rosetta Jenkins passed away without a will. She owned a house in Southwest Washington where she lived with Edward Jenkins,[1] the appellant, for eleven years. This case concerns who will inherit that house. Edward argues that he is an heir to Rosetta's estate as her common-law husband.

---

[1] Edward Jenkins previously used the name Edward McKenzie, but legally changed his name to Edward Jenkins in 2004. We refer to him and others in this case using their first names to avoid confusion.

Rosetta's only child, Tracey Johnson-Butler, the appellee, contends that she is Rosetta's sole heir because Edward and Rosetta never had a valid marriage. The Probate Court found that Tracey was Rosetta's only heir because no common-law marriage existed between Edward and Rosetta. We conclude that Edward was Rosetta's husband by common-law marriage and, therefore, an heir to her estate. We therefore reverse and remand for further proceedings.

**I.**

Edward Jenkins married Rosa Lee Carr[2] in 1969 in Rochester, New York. The couple moved to the District of Columbia around 1970, and their relationship ended a few months later without a divorce. In 1972, Edward married Rosetta Jenkins in a ceremony in the District of Columbia. Edward and Rosetta then lived together for thirty-five years, until Rosetta died.

---

[2] Rosa Lee Carr also used the name Rosa Lee McKenzie after her marriage to Edward. We refer to her as Rosa Lee as she is no longer married to Edward and to avoid confusion.

Rosetta had a daughter in 1969, Tracey Johnson-Butler, before she met Edward. After Edward and Rosetta's wedding in 1972, Tracey lived with Edward and Rosetta until Tracey turned twenty-one years old in 1990. Edward and Tracey maintained a father-daughter relationship throughout this time and after Rosetta's death. In 1996, Rosetta and Edward obtained a mortgage and bought a house. Only Rosetta's name appeared on the "Deed in Fee." The next year, Rosa Lee filed for divorce from Edward in the District of Columbia. The divorce became final in December of 1997. After the divorce and until Rosetta's death in 2007, Edward and Rosetta continued to live together in the house they had bought.

After Rosetta's passing, the Probate Court appointed Edward as the personal representative of Rosetta's estate following his petition for unsupervised probate. His appointment ended by operation of statute in 2011.[3] All the while, Edward continued to live in the house he had bought with Rosetta. Eventually, Edward wanted to sell the house. To that end, Tracey, who was helping Edward with his affairs, hired an attorney in January 2021. In April 2021, the attorney, David C.

---

[3] D.C. Code § 20-1301(c) states that "the appointment of the personal representative shall terminate automatically on the date which is 3 years after the appointment of the personal representative" if the personal representative does not file a document with the court that would otherwise terminate the appointment. D.C. Code § 20-1301(c).

Harty, filed a petition to reopen probate and reappoint Edward as personal representative. The Probate Court eventually reopened probate and reappointed Edward as personal representative in May 2021.

Around June 2021, Edward and Tracey's relationship grew strained. During this time, Edward spoke to Harty about Tracey's claimed entitlement to a share of Rosetta's estate. Then, around June 16, 2021, Edward filed a pro se petition in the Probate Court asking for "Removal of Attorney David C. Harty." Edward also sent Harty a letter of termination. Roughly one week later, Tracey filed a "Petition to Request Supervised Administration of the Estate." The Probate Court issued an order on September 2, 2021, denying Edward's petition to remove Harty and explaining that the court lacked the power to do so. However, a docket entry from the next day shows that Edward obtained new counsel.

A few weeks later, Tracey filed a petition to amend her earlier petition for supervised administration of the estate to a petition seeking to remove Edward as both the personal representative of and an heir to Rosetta's estate. This petition argued that Edward's marriage to Rosetta was void due to his prior marriage to Rosa Lee. On October 22, 2021, the Probate Court removed Edward as personal

representative. The court also barred Edward from taking any action to sell the house.

On November 9, 2021, the Probate Court held a status hearing to address whether Harty had represented Edward such that Harty (now representing Tracey) had a conflict with a former client (Edward) that would merit disqualifying Harty from representing Tracey. The next day, the court issued an order finding that Harty had never served as Edward's attorney. Accordingly, the court found no conflict of interest and did not bar Harty from representing Tracey.

On December 7, 2021, the court held a hearing on the validity of Edward's marriage to Rosetta. The court heard testimony from Edward, Tracey, and Tracey's husband. Edward claimed his marriage to Rosetta was valid because (he believed) he was too young to marry at the time he exchanged vows with Rosa Lee, precluding a lawful marriage to Rosa Lee. Edward also told the court that, in 1997, Rosetta read him a letter from Rosa Lee in which Rosa Lee asked for a divorce from him. The letter prompted Rosetta to tell Edward, "Me and you are legally married," to which he responded, "Yeah, you're right. We are legally married." Thus, according to Edward, Rosetta knew about Edward's first marriage

and his divorce when she continued to live with him after the divorce. Edward added that he and Rosetta never discussed common-law marriage because the couple "[t]hought [they] were already married."

Tracey testified that she had a close relationship with her mother, Rosetta, and that her mother never mentioned Edward's previous marriage or divorce. To Tracey's knowledge, Rosetta never found out about that part of Edward's life. Tracey's husband testified that he knew Edward and Rosetta beginning in 1998, that he understood that Rosetta was Edward's wife, and that Rosetta never told him that she and Edward "were going to get married."

Concluding that Edward was never married to Rosetta, neither via their wedding nor by a common-law marriage after Edward's first marriage ended, the Probate Court issued an order finding that Edward is not an heir.[4] First, the court found that Edward's marriage to Rosa Lee in 1969 was valid. Because of this, the court concluded that Edward and Rosetta's 1972 marriage was void ab initio because Edward was still married to Rosa Lee when Edward and Rosetta's wedding occurred. The court's order then turned to whether a common-law

---

[4] A Motions Division of this court stayed this order pending resolution of the instant appeal.

marriage between Edward and Rosetta arose after Edward and Rosa Lee were divorced in 1997.

The court identified the elements of common-law marriage as "(1) cohabitation as husband and wife . . . (2) following an express mutual agreement, which must be in words of the present tense." Edward's and Rosetta's cohabitation after Edward's divorce was undisputed, so the court's analysis focused on the second element. The Probate Court framed the question as "whether Edward Jenkins and Rosetta Jenkins entered into a *mutual* agreement to be married, by using words of the present tense, *on or after* the date that [Edward] Jenkins became divorced from Rosa Lee Carr" (second emphasis added). The court identified, as a "central issue" to its analysis, whether Rosetta knew about Edward's marriage to Rosa Lee.

Applying this framework, the court determined that no common-law marriage existed. The court did not credit Edward's testimony that Rosetta knew about his marriage to Rosa Lee because (1) the court considered Edward's testimony about his marriage to Rosa Lee "false and conflicting" and thus damaging to his overall credibility; (2) Edward called no witnesses to support his

claim; and (3) Edward included a note in Rosetta's funeral program that referred to November 25, 1972, (not to his post-1997 relationship with Rosetta or to their cohabitation as spouses during the years that followed) as when their marriage began.  By contrast, the court "fully credit[ed]" and found "no reason to doubt" Tracey's testimony about her close relationship with her mother and her testimony that, to her knowledge, Rosetta did not know about Edward's first marriage.  The court "infer[red] that [Rosetta] would have told her daughter about the divorce and about learning that the marriage was not valid."  The court also made two additional inferences based on the evidence that Rosetta was a member of a church and that the same bishop officiated at her wedding and funeral: first, that Rosetta would have told someone from church about the divorce and about any agreement she had with Edward that the two were still married despite their void ab initio ceremonial marriage; and second, that Rosetta "placed value on church weddings and other formal church proceedings, and therefore, likely would not have agreed to a common law marriage."

Further, the court cited Edward's testimony disavowing having a common-law marriage and insisting that he and Rosetta had a "legal marriage" instead. From this, the court concluded that Edward and Rosetta "never could have met the requirements of 'an express mutual agreement, which must be in words of the

present tense,'" and that Edward "presented no reason why he and [Rosetta would have] entered a mutual agreement in the present tense in 1997, after the divorce." The court concluded that Rosetta was unaware of Edward's first marriage and, therefore, that there was no "express mutual agreement" between Rosetta and Edward "to be married under the common law after [Edward's] divorce in 1997." The court stated that without a marriage to Rosetta, Edward could not be an heir to her estate. Edward timely appealed.

## II.

On appeal, Edward argues that under binding case law (which the parties did not cite to the Probate Court), the credited evidence showed all that was necessary to establish that he and Rosetta had a valid common-law marriage and that he therefore is an heir to Rosetta's estate. *See* D.C. Code § 19-301. We agree and therefore reverse the Probate Court's ruling to the contrary.[5]

---

[5] We have not been asked to review the Probate Court's order removing Edward as the estate's personal representative.

**A.**

Whether a common-law marriage exists "is a mixed question of fact and law." *Gill v. Nostrand*, 206 A.3d 869, 877 (D.C. 2019). We therefore review the Probate Court's factual findings for clear error and its legal rulings de novo. *See Associated Ests. LLC v. BankAtlantic*, 164 A.3d 932, 939 (D.C. 2017); *Am. Univ. Park Citizens Ass'n v. Burka*, 400 A.2d 737, 741 (D.C. 1979). Here, Edward does not contest the Probate Court's specific factual findings. Instead, he asserts that the Probate Court committed a legal error by overlooking binding, factually analogous precedents that compel finding a common-law marriage.

The elements of common-law marriage are "cohabitation following an express mutual agreement, which must be in words of the present tense, to be permanent partners with the same degree of commitment as the spouses in a

---

Edward raises an additional argument that we need not and do not reach: the contention that the Probate Court's findings cannot stand because its reliance on Tracey's testimony violated the District's "Dead Man's Statute," D.C. Code § 14-302. We also do not reach Edward's argument that Harty should be disqualified from representing Tracey in ongoing proceedings because Harty violated D.C. R. Prof. Conduct 1.9. We do not address this argument because Edward does not contend that the Probate Court's decision not to disqualify Harty is a basis for reversal of the ruling that Edward was not married to Rosetta and is not an heir.

ceremonial marriage." *Gill*, 206 A.3d at 875.  Cohabitation is undisputed here, so we focus on whether Edward and Rosetta made "an express mutual agreement, which must be in words of the present tense, to be permanent partners with the same degree of commitment as the spouses in a ceremonial marriage." *Id.*  In doing so, we clarify when such express mutual agreement must occur in cases like this one, in which (1) a couple expressly agreed to be married, (2) a legal impediment (here, a prior marriage) made the couple's ceremonial marriage void ab initio, (3) the couple cohabited as spouses, and (4) the impediment was removed and the couple continued to cohabit as spouses.  Tracey argues, and the Probate Court ruled, that the couple must agree anew after the impediment is removed. Edward counters that if the couple continue to cohabit as spouses, the couple need not repeat their express agreement to be married after the impediment is removed. Under *Thomas v. Murphy*, 107 F.2d 268 (D.C. Cir. 1939), and its progeny, Edward's position is the correct one.

Our case law is not completely uniform in addressing how the removal of an impediment to marriage affects the status of a couple who agreed to marry before the impediment's removal and cohabitated as spouses before and after the

impediment's removal. In *Thomas v. Murphy*, the D.C. Circuit[6] adopted the rule that, after a couple agrees to marry, "the removal of an impediment while parties continue to live together as husband and wife gives rise to a common-law marriage," "though one or both of the parties knew of the impediment." 107 F.2d at 269;[7] *accord Matthews v. Britton*, 303 F.2d 408, 410 (D.C. Cir. 1962) ("If Ernestine and Henry Matthews agreed to be married before the impediment [i.e., Ernestine's 1919 marriage to Johnson] was removed [through Johnson's obtaining a divorce] and continued thereafter to cohabit and live together as husband and wife, a commonlaw union between Ernestine and Henry was effected when Johnson was awarded the divorce.") (citing *Thomas v. Murphy*, 107 F.2d at 268); *id.* at 409 ("It is not to be expected that parties once having agreed to be married will deem it necessary to agree to do so again when an earlier marriage is

---

[6] Cases decided by the United States Court of Appeals for the District of Columbia Circuit, and its predecessors, before February 1, 1971, are part of this court's case law. *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971).

[7] The facts of *Thomas v. Murphy* are that William M. Murphy and Elizabeth Dixon agreed to become husband and wife and began to cohabit as spouses in 1904 even though William was already married to Harriet. 107 F.2d at 269. Harriett obtained a divorce from William in 1918, and William and Elizabeth then continued to live as husband and wife. *Id.* The court acknowledged that "[c]ases where, as here, one or both of the parties knew of the impediment, have sometimes been treated as exceptions to the general rule that the mere removal of the impediment, with continued cohabitation, results in a common-law marriage[.]" *Id.* But the court reasoned that the general rule, rather than such an exception, is "socially sound" and "logical." *Id.*

terminated or some other bar to union is eliminated."); *Taylor v. Taylor*, 233 A.2d 43, 44 (D.C. 1967) (referring to the "settled" principle that "if parties agree to be husband and wife in ignorance of, or with knowledge of, an impediment to lawful matrimony, the removal of that impediment results in a common law marriage between the parties if they continue to cohabit and live together as husband and wife") (citing *Matthews*, 303 F.2d at 408).[8]  Thus, per *Thomas v. Murphy* and its progeny, a common-law marriage is created even if the agreement to marry predates the removal of an impediment to marriage, provided the couple cohabit as spouses before the impediment's removal and continue to cohabit as spouses after the impediment is removed.

In a few post-1939 cases, the D.C. Circuit and this court applied a contrary rule, but did so in language that may fairly be regarded as dicta, i.e., language not necessary to the decision.  *See U.S. Fid. & Guar. Co. v. Britton*, 269 F.2d 249, 251 (D.C. Cir. 1959); *Coates v. Watts*, 622 A.2d 25, 27 (D.C. 1993).  In discussing common-law marriage, *United States Fidelity* articulated a "rule" that "when a

---

[8] By contrast, if a couple "ceased [their] relationship" as husband and wife before the impediment to a marriage between them is removed, no common-law marriage arises. *Friedenwald v. Friedenwald*, 16 F.2d 509, 510 (D.C. Cir. 1926); *see also Thomas v. Murphy*, 107 F.2d at 269 n.2 (attributing this result in *Friedenwald* to there having been "no cohabitation after the removal of the impediment").

man and woman *who are legally capable of entering into the marriage relation mutually agree*, in words of the present tense, to be husband and wife, and consummate their agreement by cohabiting as husband and wife, a common-law marriage results." 269 F.2d at 251 (emphasis added);[9] *see also Toye v. Toye*, 170 A.2d 778, 778 (D.C. 1961) ("It is essential to the validity of such a marriage that parties, *legally capable of entering into that relationship*, mutually consent or agree to do so, and that the agreement be consummated by cohabitation.") (emphasis added) (citing *U.S. Fid.*, 269 F.2d at 249). The *United States Fidelity* court also said that cohabitation "could not ripen into a common-law marriage unless it was pursuant to a mutual consent or agreement to become husband and wife made *after* the removal of . . . [a] supposed . . . barrier" to marriage. *Id.* at 254 (emphasis added). But it seems that the dispositive fact in *United States Fidelity* was that the claimant (see note 9 *supra*) "did not testify there was mutual consent or agreement [to be married] *at any time*." *Id.* at 253 (emphasis added).

---

[9] *United States Fidelity* involved a claim for death benefits brought by a claimant who maintained that she had been in a common-law marriage with the decedent. 269 F.2d at 250-51. The claimant had incorrectly believed that she was married to a man other than the decedent, so she testified that she did not intend to marry the decedent while her thought-to-be first husband lived. *Id.* at 253. The claimant's "first husband" died before the decedent, but even after this death, the claimant did not agree to marry the decedent, per her testimony. *Id.* The court therefore held that no common-law marriage arose because there was no evidence of "a mutual agreement to be married." *Id.*

A similar observation can be made about *Coates*. The case concerned a couple, Mr. Coates and Ms. McCall, who started cohabitating around 1971, despite the fact that Coates was married to someone else at the time. 622 A.2d at 26. Coates obtained a divorce in 1976, and afterwards he asked McCall to marry him. *Id.* She declined. *Id.* Eventually, in 1990, McCall agreed "to marry [Coates] the following year," but "she died before the marriage could take place." *Id.* Coates argued that he and McCall had a common-law marriage. *Id.* The court quoted *United States Fidelity* and discussed whether there was evidence that "after [Coates's] divorce" — i.e., after the "remov[al] [of] the initial impediment" — Coates and McCall had agreed to be married. *Id.* (footnote omitted) & n.1. But just as important to the court's analysis was its observation that Coates had offered no evidence that he and McCall "*had ever* agreed, *in words of the present tense*, to be married." *Id.* (emphasis added).

In any event, neither *United States Fidelity* nor *Coates* could have overruled *Thomas v. Murphy*. *See LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996) (en banc) ("One three-judge panel [of the D.C. Circuit] . . . does not have the authority to overrule another three-judge panel of the court. . . . That power may be exercised only by the full court[.]") (citations omitted); *M.A.P. v. Ryan*, 285

A.2d 310, 312 (D.C. 1971) ("With respect to decisions of the United States Court of Appeals rendered prior to February 1, 1971, . . . they, like the decisions of this court, constitute the case law of the District of Columbia. . . . [N]o division of this court will overrule a prior decision of this court or refuse to follow a decision of the United States Court of Appeals rendered prior to February 1, 1971[.] . . . [S]uch result can only be accomplished by this court en banc.") (footnote omitted); *see also Thomas v. United States*, 731 A.2d 415, 420 n.6 (D.C. 1999) ("Where a division of this court fails to adhere to earlier controlling authority, we are required to follow the earlier decision rather than the later one.").

Moreover, in *Matthews*, the D.C. Circuit explicitly rejected the notion that *United States Fidelity* (which cited *Thomas v. Murphy* approvingly) effectively overruled *Thomas v. Murphy*. *See* 303 F.2d at 410. The *Matthews* court highlighted that in *United States Fidelity*, there was no evidence of any agreement to marry and explained that "the holding of [*United States Fidelity*] is that if there was no agreement to be married, either before or after the removal of an impediment, no marriage can take place." *Id.* In effect, *Matthews* resolved any confusion or contradiction that *United States Fidelity* created in our jurisprudence regarding whether parties must agree *after* an impediment is removed to form a common-law marriage. We are bound to adhere to the rule that "the removal of an

impediment while parties continue to live together as husband and wife gives rise to a common-law marriage." *Thomas v. Murphy*, 107 F.2d at 269.

In light of the foregoing binding precedents, the Probate Court misarticulated the rule governing the express-mutual-agreement element of common-law marriage. The parties failed to cite these precedents, and the court's order relied on the mistaken proposition that the express mutual agreement must come after the impediment to marriage is removed. However, as explained above, the agreement element can predate the removal of an impediment if the parties continue to cohabit after the impediment's removal.

In sum, we confirm that where a couple makes an express mutual agreement in words of the present tense to be married despite a known or unknown legal impediment to marriage, and that agreement is followed by cohabitation, the couple need not reaffirm their agreement after the impediment to marriage dissolves; they need only continue to cohabit.

**B.**

When the above legal framework is applied to the instant case in light of the undisputed facts, the conclusion is compelled that Edward and Rosetta formed a common-law marriage when they continued to live together after Edward's divorce.[10] There is no dispute that in 1972, Edward and Rosetta shared a wedding ceremony at which they expressed a mutual agreement to marry in words of the present tense. Edward and Rosetta then cohabited for thirty-five years, spanning years both before and after Edward's divorce from Rosa Lee in 1997. Thus, despite Edward's past marriage, the couple established a common-law marriage under *Thomas v. Murphy* and *Matthews* because of their agreement to marry, their subsequent cohabitation, Edward's divorce removing the impediment to their marriage, and their continued cohabitation after Edward's divorce.

Because Edward did not need to prove that he and Rosetta entered into an express mutual agreement to marry after his divorce in 1997, the Probate Court's focus on Rosetta's knowledge — of Edward's first marriage in 1969, its voiding effect on their 1972 marriage, and Edward's divorce — was misplaced.

---

[10] *Cf. Friedenwald v. Friedenwald*, 16 F.2d 509, 511 (D.C. Cir. 1926) ("[I]t is to be presumed that the intent to be husband and wife, expressed in the ceremonial marriage, continues, unless the contrary appears, and the continued cohabitation after the removal of the impediment is to be considered as under such an intent and declaration rather than with an unlawful intent. . .").  Here, there was no contrary evidence.

Essentially, the Probate Court reasoned that Rosetta could not create a common-law marriage with Edward unless she knew that her ceremonial marriage was void because of Edward's first marriage. But whether Rosetta knew about Edward's first marriage is immaterial. As explained above, in cases like this one, the agreement to marry may be made "in ignorance of, or with knowledge of, an impediment to lawful matrimony." *Taylor*, 233 A.2d at 44.

Finally, we briefly address Tracey's argument that Edward's testimony that his marriage to Rosetta was "no common-law marriage," but a "legal marriage" undercuts his argument that he had a common-law marriage.[11] This argument cannot overcome the legal consequence under *Thomas v. Murphy*, *Matthews*, and *Taylor*, that a common-law marriage existed between Edward and Rosetta after Edward's divorce and the couple's continued cohabitation.[12] Moreover, this

---

[11] Tracey also argues that, because of this testimony, Edward waived his common-law marriage argument such that he cannot raise it on appeal. This argument lacks force because, after Edward gave this testimony, Edward's attorney argued in closing that a common-law marriage existed.

[12] Further, it is of no moment whether Rosetta and Edward agreed to form a *common-law* marriage. Our cases uniformly state that the parties to a common-law marriage need only agree to be spouses or "to be permanent partners with the same degree of commitment as the spouses in a ceremonial marriage," *Gill*, 206 A.3d at 875; *see Hoage v. Murch Bros. Constr. Co.*, 50 F.2d 983, 985 (D.C. Cir. 1931) (articulating the agreement element of common-law marriage as "an *agreement*

argument overlooks that many (perhaps most) lay people "are not likely to be perceptive in respect to technicalities" surrounding whether they have a "common-law" or "legal" marriage. *Matthews*, 303 F.2d at 411 (Prettyman, J., concurring in part and dissenting in part).

## III.

For the foregoing reasons, we reverse the Probate Court's ruling that Edward and Rosetta had no common-law marriage and that Edward is not an heir, and we remand for further proceedings consistent with this opinion.

*So ordered.*[13]

---

between a man and woman per verba de praesenti *to be husband and wife*") (emphasis added). The couple need not agree to form a "common-law" marriage.

[13] The court thanks Ms. Ugolini for her *pro bono publico* representation of Mr. Jenkins in this case.