**Ricardo GALBIS, Appellant,**

v.

**Vilma Y. NADAL, Appellee.**

**No. 96–FM–1415.**

District of Columbia Court of Appeals.

Argued June 9, 1998.
Decided July 29, 1999.

See also 626 A.2d 26.

---

Ricardo Galbis, appellant pro se.

Luis A. Perez, Arlington, VA, for appellee.

Before TERRY, STEADMAN, and SCHWELB, Associate Judges.

TERRY, Associate Judge:

Appellant Ricardo Galbis appeals from an order of the trial court denying his motions to reduce child support and to allow his son to visit Cuba with him and providing that all overnight visits must include an adult caretaker for the child.[1] He argues that the court's factual findings were clearly erroneous and that the court therefore abused its discretion in denying his motions. Appellant also contends that the court erred in refusing to consider any evidence regarding his business expenses for the years 1992 through 1995 as a sanction for his failure to comply with several discovery requests and orders. We affirm.

---

1. The order also awarded certain attorney's fees to appellee, but appellant does not challenge that portion of the order.

## I

### A. *Background*

Ricardo Galbis, M.D., and Vilma Y. Nadal, Ph.D., are the parents of a minor son, Ricardo José Galbis, who is now fourteen years old. On November 14, 1989, in response to Dr. Nadal's complaint for custody and support, the court issued a temporary order requiring Dr. Galbis to pay $1,048 per month in child support, plus the full costs of private school tuition ($200 per month) and mental health therapy ($387 per month), and to maintain health insurance for his son. The child support figure was based, in part, upon Dr. Galbis' annual gross income of $144,000 ($89,416 net) and Dr. Nadal's annual gross income of $27,816 ($19,284 net).[2]

On April 16, 1990, the court entered a permanent order granting the parties joint custody of their son. Dr. Nadal was awarded primary physical custody and final decision-making authority; Dr. Galbis was granted weekend and summer visitation with the requirement that his housekeeper, Myra Hernandez, or another adult with child care experience be present during any overnight visits. The order further provided that both parties must agree before the son could travel to Cuba with his father. In addition, addressing Dr. Nadal's concerns that Dr. Galbis was an unsafe driver, that he sometimes would drive after drinking alcohol, and that his convertible lacked seat belts, the court permitted Dr. Galbis to transport Ricardo José in a car only if the child was wearing a seat belt. The court also limited such travel to the District of Columbia and places within a twenty-five mile radius of the District.

On August 16, 1991, the court entered another order requiring Dr. Galbis to pay $2,471 per month in child support and one-half of his son's school and summer camp tuition, and to maintain health and life insurance for the benefit of his son until he reaches the age of majority. The child support figure was calculated under the statutory child support guideline, D.C.Code § 16–916.1 (1997), using the father's average gross income for 1989 and 1990 and his projected income for 1991 ($175,471.40), the mother's gross income ($32,016), and the child's monthly expenses ($2,084).

The August 16 order also addressed the parties' cross-motions for modification of the custody order. Finding that Dr. Nadal had demonstrated changed circumstances, that the parties had failed to achieve any degree of cooperation concerning the care of their son, and that the existing joint custody arrangement was not in the best interests of the child, the court awarded sole custody to Dr. Nadal. Dr. Galbis was granted liberal visitation rights, but the overnight supervision requirement, the limitation on travel to Cuba, and the driving restrictions were not changed.[3]

On December 19, 1991, ruling on Dr. Galbis' motion for reconsideration, the court found that payment of one-half of Ricardo José's tuition was a redundant obligation because the tuition expense had already been included in calculating the amount of child support. Accordingly, the court reduced the monthly payment by $333, leaving a total monthly payment of $2,138.

Dr. Galbis appealed from the August 16 and December 19 orders, and this court affirmed them both. *Galbis v. Nadal,* 626 A.2d 26 (D.C.1993) (*"Galbis I"*).

### B. *The Present Dispute*

On February 21, 1995, Dr. Galbis through counsel moved to reduce his child support payments, arguing that because of a "drastic reduction in income," his month-

---

2. The November 14 order and several subsequent orders in 1990, 1991, and 1992 are not in the record. Our summary of their terms is based on the trial court's order of September 8, 1996.

3. The distance restriction on driving was lifted by order of March 18, 1992, but the seat belt requirement remained in effect.

ly support obligation no longer comported with the child support guideline. About two months later, on April 17, Dr. Galbis *pro se* moved for permission to take his son to visit his grandmother (Dr. Galbis' mother, who was then ninety-one) in Cuba and to eliminate the caretaker requirement for overnight visits. The motions were consolidated and set for a hearing on July 25.

Before the hearing could be held, however, Dr. Nadal served Dr. Galbis with interrogatories and requests for production of documents, including tax returns and financial statements. Two months later, after Dr. Galbis had failed to respond fully to the discovery requests, Dr. Nadal moved to compel discovery and asked for sanctions.[4]

When the case came on for a hearing on July 25, the court quickly recognized that Dr. Nadal was unable to proceed on the motion to reduce child support until the outstanding discovery issues were resolved. The parties agreed to work toward a resolution and to continue the hearing on the motions to compel discovery and reduce child support until October. Also, by agreement of the parties, the hearing on Dr. Galbis' *pro se* motions was continued until the next day, July 26. Finally, with counsel present, the court met with Ricardo José in an "off-the-record" session in chambers. Later the same day the parties met again in an "off-the-record" session and, in light of the court's discussions with the child, established a revised visitation schedule that was to be reviewed again on October 2. The case was then transferred to another judge, who eventually made the rulings that are challenged on this appeal.

### C. *The November 8 Hearing*

After further proceedings concerning discovery, the court held a hearing on November 8, 1995, on the issues relating to visitation.

Dr. Galbis testified that in his opinion the court should remove the caretaker restriction because the constant presence of a "babysitter" during visits—in particular, Myra Hernandez—hindered his relationship with his son.[5] Also, because Ricardo José was older now and visited other people's homes on his own—indeed, he had traveled to Puerto Rico by himself—Dr. Galbis felt that he did not need a "keeper." When Ricardo José was younger, he would often call his mother from Dr. Galbis' house and ask to be picked up. In recent years, however, the relationship had been better; he and his father would go to the beach together and go crabbing, canoeing, and hiking. Dr. Galbis stated that he was capable of taking care of his son and that he also took care of and traveled with his sixteen-year-old daughter from a previous marriage, Maya, without any assistance. He testified that if he were called to the hospital for an emergency while Ricardo José was visiting, he could arrange for the boy to come with him or leave him with a caretaker, either another parent or Ms. Hernandez.

Dr. Galbis said that he had wanted to take Ricardo José to New York to visit Maya, but that Dr. Nadal had refused to consent. With respect to Cuba, Dr. Galbis testified that President Clinton had lifted travel restrictions for Cuban nationals (Dr. Galbis is a Cuban national) and their families.[6] Ricardo José had also expressed a desire to go to Cuba with his father and his half-sister Maya.

Myra Hernandez had worked for the parties for ten years, first for Dr. Nadal and then, for the past three months, solely for Dr. Galbis. Ms. Hernandez testified that the relationship between Dr. Galbis

---

**4.** Before filing the motion, Dr. Nadal's counsel made several written and oral requests for production, but they were all unsuccessful.

**5.** Dr. Galbis also complained that he had to pay Ms. Hernandez an extra $500 when she accompanied him and his son to the beach on weekends.

**6.** Without objection, Dr. Galbis moved into evidence a copy of a White House press release announcing the President's action.

and his son during the most recent visits had not been good: "they were always fighting," yelling, and insulting each other. According to Ms. Hernandez, Ricardo José was a child who always needed to be watched "because if you let him do what he wants, he does crazy things." When he was at his mother's house, he was generally well-behaved and had a pleasant attitude; "he [was] much more quiet." But when he knew he would be going to visit his father, he became "hysterical" and insisted that he did not want to go. Ms. Hernandez said she had heard Dr. Galbis tell his son that the only reason he did not want to see his father was that his mother had been "brainwashing him." Dr. Galbis also told his son that his mother was a "witch." On cross-examination Ms. Hernandez said that Dr. Nadal would encourage her son to visit his father, but "he would say no." There were also times when he would call his mother from his father's house "hysterical, crying," and ask her to come and pick him up; "she would come right away."

Ms. Hernandez recounted an incident the previous summer at Dr. Galbis' beach house. When Ricardo José asked Ms. Hernandez if he could go swimming in the ocean, she said he could not because the weather was bad. Dr. Galbis, however, said it was all right for him to go. When the boy went out into the ocean, his father "wasn't watching him close enough," and he swallowed a lot of water and had to be rescued by a lifeguard. On the way back to Washington that night, Dr. Galbis drove "so fast that the boy told him to slow down ." Ms. Hernandez also testified about another summer weekend when Ricardo José was staying with his father and there was no food in the house; she went to the store and bought food with her own money.

Additional evidence on Dr. Galbis' motion to modify visitation was presented at another hearing on November 20, but the transcript of that hearing is not in the record. *See Cobb v. Standard Drug Co.,* 453 A.2d 110, 111 (D.C.1982). The record does indicate, however, that at the conclusion of the November 20 hearing the court denied Dr. Galbis' motion.

### D. *The April 30 Hearing*

After Dr. Galbis renewed his motions to reduce child support and to allow a visit to Cuba, the court held further hearings on April 30 and July 12, 1996. At the April 30 hearing, Mark Turok, C.P.A., who had been Dr. Galbis' accountant for more than ten years, testified at length about Dr. Galbis' income tax returns for 1992 through 1995 and the overall decline in his income over that period.[7] He said that Dr. Galbis derived income from several sources, including his private psychiatric practice and the Andromeda Mental Health Clinic, of which he is the founder and director. Mr. Turok confirmed that Dr. Galbis' income from his private practice had decreased from $161,067 in 1992[8] to $79,059 in 1995, as a result of cutbacks in managed care, a decrease in reimbursements from insurance companies, and an increase in the number of referrals of indigent patients. On the other hand, Mr. Turok testified, Dr. Galbis' salary from the Andromeda Clinic had slightly increased. He also said that Dr. Galbis had been audited by the Internal Revenue Service for every year from 1985 through 1990 and that his business expenses were examined during those audits.

On cross-examination of Mr. Turok, counsel for Dr. Nadal challenged the calculation of Dr. Galbis' net income as claimed on his 1992–1994 tax returns by questioning several of his business expenses. Mr. Turok stated that he did not have the data pertaining to those expenses with him. Counsel moved to strike Mr. Turok's testimony "as to the characterization and purpose of the expenses claimed in the tax

---

**7.** The court accepted Mr. Turok as an expert in accounting upon the parties' stipulation.

**8.** The record, including the testimony of Mr. Turok, does not include evidence of Dr. Gal-

bis' income for 1992; this figure comes from the trial court's order of September 8, 1996.

returns in 1992, 1993, and 1994," asserting that the relevant documents had been specifically requested but not provided during discovery. After further discussion, the court continued the hearing and ordered that Dr. Galbis and Mr. Turok submit the necessary documentation by May 9.

### E. *The July 12 Hearing*

When the hearing reconvened on July 12, Dr. Galbis had not yet complied with the court's discovery order of April 30. Counsel for Dr. Nadal moved to have Dr. Galbis held in contempt. The court took note of Dr. Galbis' repeated refusals to comply with its orders and treated Dr. Nadal's motion as one for sanctions. It ordered that all evidence concerning Dr. Galbis' business expenses based on his 1992–1995 tax returns, including all documents and testimony from Mr. Turok, be stricken from the record and awarded related attorney's fees to Dr. Nadal.

Dr. Galbis then took the stand.[9] He testified that his income had decreased since 1991, mainly because of difficulties with Medicaid and Medicare reimbursements. He said he had not voluntarily worked fewer hours since 1991, nor had he otherwise attempted to reduce his income. On cross-examination, however, counsel for Dr. Nadal elicited that although Dr. Galbis' income had been relatively consistent from January to May 1995, it had dropped dramatically after the filing of his motion to reduce child support. Dr. Galbis asserted that this decline in income was attributable to the District of Columbia's widely publicized financial problems and its failure to reimburse vendors, such as himself, for services rendered.

Because both parties maintained that circumstances had changed since April 30, the court heard additional testimony on the motion to modify visitation. Dr. Galbis

testified that, with the consent of Dr. Nadal, Ricardo José had spent several nights in his home without a caretaker. On a couple of those occasions, Jacqueline Maggi, Dr. Galbis' "woman friend," was present. According to Dr. Galbis, his son had "a good relationship" with Ms. Maggi. She had also accompanied Dr. Galbis and his son on an overnight trip to New York. During that trip, Dr. Galbis testified, he had to remind Ricardo José to call his mother so that she would not worry.

Dr. Nadal confirmed that she liked Jacqueline Maggi and the way she related to Ricardo José. With respect to the trip to New York, however, Dr. Nadal testified that she was concerned because the car in which they were driving had rusty seat belts in the back seat, and because she also saw a bottle of vodka in the car. (Dr. Galbis told her that it was filled with water.) Dr. Nadal stated that, despite her concerns, she let her son go with his father and Ms. Maggi because she knew he was really looking forward to the trip. Finally, Dr. Nadal testified that, while in New York, Dr. Galbis gave Ricardo José a different type of Ritalin from the type he usually takes—"the one that lasts longer."

### F. *The Court's Order*

On September 8, 1996, in a fifteen-page order, the court reviewed the lengthy history of the case and the evidence presented during the several days of hearings. With respect to the motion to reduce child support, the court noted that in order to modify an existing support order, the moving party "must demonstrate a substantial and material change in the party's ability to pay ...." Reviewing Dr. Galbis' gross income for the previous four years [10] under the child support guideline, D.C.Code § 16–916.1, the court found that Dr. Galbis

9. During Dr. Galbis' testimony, the court reminded him that it would only hear evidence regarding his gross income, and would not accept evidence relating to income adjusted to reflect business expenses.

10. From the testimony and the documents in evidence, the court calculated Dr. Galbis' gross income as follows:

| | |
|---|---|
| 1992 | $250,439 |
| 1993 | $204,378 |
| 1994 | $192,636 |
| 1995 | $163,308 |

had failed to demonstrate such change. The court acknowledged that, had it not been constrained by the discovery sanctions to consider only Dr. Galbis' gross income—as opposed to his adjusted gross income, which would allow for "reasonable and necessary business expenses"[11]—in its calculations, the result would have been different.

As for Dr. Galbis' request for permission to take Ricardo José to Cuba, the court found that Dr. Galbis had failed to demonstrate:

> (a) that travel to Cuba can be effectuated safely, (b) that the planned trip is in accord with the laws of the United States, and (c) that Ricardo José desires to go on the trip.

Accordingly, the court denied Dr. Galbis' request.[12] It did not, however, preclude all possibility of a trip to Cuba in the future. The court agreed that Ricardo José should enjoy the benefits of visiting with his Cuban relatives and encouraged the parties to devise a mutually acceptable plan for him to do so. Prior court approval would not be necessary for such a trip, the court said, so long as Dr. Nadal "is consulted and fully agrees with any travel arrangements."

Regarding Dr. Galbis' request to remove the caretaker requirement from the visitation order, the court considered Ricardo José's age, the fact that he had recently visited his father overnight without incident, and the fact that his father's friend, Ms. Maggi, had a good relationship with him. Although these factors weighed in Dr. Galbis' favor, the court also took note of what it regarded as examples of poor judgment on the part of Dr. Galbis: the rusty seat belts in his car, the vodka bottle in the car (regardless of its contents), and the unilateral decision to substitute Ricardo José's usual dosage of Ritalin with a different dosage. Balancing all these factors, the court found that it was in the child's best interest to leave the caretaker requirement in place, although it expanded the requirement by ruling that it could be met by the presence of Jacqueline Maggi.

## II

 The trial court has broad discretion in making child support decisions. Absent a showing of abuse of that discretion, such decisions, both under the statutory guideline and independent of the guideline, will not be disturbed on appeal. *E.g., Weiner v. Weiner,* 605 A.2d 18, 20 (D.C.1992); *Brice v. Brice,* 411 A.2d 340, 344 (D.C.1980). By statute, the court may modify an existing child support order only upon a showing by the moving party "that there has been a substantial and material change in the needs of the child or the ability of the responsible relative to pay since the day on which the order was issued." D.C.Code § 30–504(a) (1998); *see also Robinson v. Robinson,* 629 A.2d 562, 567 (D.C.1993); *Guyton v. Guyton,* 602 A.2d 1143, 1145 (D.C.1992). "[I]n ruling on a motion to modify child support payments, [the court] must determine whether, in fact, there is the financial ability to pay." *Garcia v. Andrade,* 622 A.2d 64, 66 (D.C.1993).

The child support guideline statute provides in part:

> There shall be a presumption that there has been a substantial or material change of circumstances that warrants a modification of a child support order if application of the guideline to the current circumstances of the parties results in an amount of child support that varies from the amount of the existing child support order by 15% or more.

D.C.Code § 16–916.1(o)(3). This presumption may be rebutted by a showing of special circumstances which would take

---

**11.** The court noted, for example, that Dr. Galbis' gross business income for 1995 totaled $79,059, while his net business income totaled only $14,812.

**12.** Dr. Galbis had submitted a letter from his mother in Cuba requesting the court to allow the visit. The court refused to consider this letter because it had been offered *ex parte* and had not been admitted in evidence.

the matter outside the guideline. D.C.Code § 16–916.1(*o*)(3)(A); *see also Robinson v.. Robinson,* 629 A.2d at 567–568.

■ In the instant case, application of the guideline to the facts does not raise a presumption in favor of modification. In its initial order, the court calculated Dr. Galbis' monthly obligation at $2,138, based on his income of $175,471.40. *See Galbis I,* 626 A.2d at 29–30 & n. 6 (discussing the calculation of the support payment). In the order now before us, the court began with Dr. Galbis' current income of $163,-308. Giving him credit for his support payments for his daughter Maya ($600 per month), the court then calculated his minimum monthly obligation under the guideline at $2,455.[13] Under D.C.Code § 16–916.1, the presumption "that there has been a substantial or material change of circumstances that warrants a modification of a child support order" arises only when there is a variation of 15 percent or more between the original support figure and what that figure would be if it were based on "current circumstances." Since the variation in this case is only 13 percent, the presumption does not arise. Consequently, although the unavailability of the presumption would not necessarily be conclusive when the trial court is considering a request for modification, it certainly minimizes the likelihood that this court would find an abuse of discretion. *Cf. Weiner v. Weiner,* 605 A.2d at 20–21. We hold, therefore, that since Dr. Galbis cannot rely on the statutory presumption, he has failed otherwise to show a sufficient change in circumstances to require a change in his support obligation. It follows that the trial court did not abuse its discretion in denying his motion.

### III

■ In its order, the court recognized that, if it had not been precluded by the discovery sanction from using an income figure that took into account Dr. Galbis'

reasonable and necessary business expenses, the test for the presumption in favor of modification would probably have been met. That fact, however, does not warrant reversal.

■ The Superior Court Rules empower the court to impose sanctions, including the exclusion of evidence, for failure to comply with discovery orders. *See* Super. Ct. Dom. Rel. R. 37(b) (identical to Super. Ct. Civ. R. 37(b)); *see also, e.g., Perry v. Sera,* 623 A.2d 1210, 1215–1217 (D.C.1993). Generally, the exercise of this power is subject to review only for abuse of discretion. *Vernell v. Gould,* 495 A.2d 306, 311 (D.C.1985). Where sanctions are imposed for non-compliance with discovery orders short of dismissing the case—*i.e.,* the exclusion of evidence—there are five factors that the trial court should consider:

> (1) whether allowing the evidence would incurably surprise or prejudice the opposite party;
>
> (2) whether excluding the evidence would incurably prejudice the party seeking to introduce it;
>
> (3) whether the party seeking to introduce the [evidence] failed to comply with the evidentiary rules inadvertently or willfully;
>
> (4) the impact of allowing the proposed [evidence] on the orderliness and efficiency of the trial [or hearing]; and
>
> (5) the impact of excluding the proposed testimony on the completeness of information before the court or jury.

*Abell v. Wang,* 697 A.2d 796, 801 (D.C. 1997) (citations omitted). These factors also apply when an order excluding evidence has the same effect as a dismissal. *Id.* at 802.

Although the second and fifth of these factors tend to favor Dr. Galbis, they are outweighed by the remaining three. First, given Dr. Galbis' repeated refusals to comply with the court's explicit orders, he

---

**13.** "The central figure stated in the guideline shall be used to compute the amount of child support that the guideline would yield for

modification and to apply the test for the presumption." D.C.Code § 16–916.1(*o*)(4).

cannot seriously contend that his actions were anything but willful.[14] Moreover, Dr. Galbis' failure to provide discovery effectively precluded Dr. Nadal from cross-examining Mr. Turok, thereby prejudicing her case. Finally, Dr. Galbis' actions caused unnecessary delays and prejudiced the administration of justice. *See Perry v. Sera,* 623 A.2d at 1219 ("Noncompliance with court orders ... may cause the system to bog down and may adversely affect other litigants"). Considering all five factors in the circumstances of this case, and recognizing that two of them operate to some extent in favor of Dr. Galbis, we nevertheless hold that the court did not abuse its discretion in excluding the evidence of Dr. Galbis' business expenses.

## IV

Dr. Galbis challenges the court's refusal to remove the caretaker requirement from its visitation order. This ruling, like virtually all other child custody rulings, is subject to reversal only for clear abuse of discretion. *Fitzgerald v. Fitzgerald,* 566 A.2d 719, 721 (D.C.1989); *Hamel v. Hamel,* 489 A.2d 471, 475 (D.C.1985). Under the governing statute, an order relating to custody may be modified only if the moving party shows "that there has been a substantial and material change in circumstances and that such modification ... is in the best interest of the child." D.C.Code § 16–911(a–2)(4)(A) (1997). The

trial court held that Dr. Galbis failed to make such a showing, and we find no abuse of discretion in that ruling.

The court explicitly ruled that Dr. Galbis had not met his burden of demonstrating that circumstances had changed to the extent that removal of the caretaker requirement would be in Ricardo José's best interest. After reviewing the evidence and discussing Dr. Nadal's concerns about Dr. Galbis' care for Ricardo José, the court expressed its own misgivings about Dr. Galbis' poor judgment and cited specific examples of that poor judgment. We find no basis in the record for concluding that the trial court abused its discretion in directing that Ricardo José's overnight stays continue to be supervised.[15] Similarly, given the court's enumeration of its concerns regarding a trip to Cuba, there is no basis for finding error in its decision not to allow such a trip. *See, e.g., Ysla v. Lopez,* 684 A.2d 775, 780–781 (D.C.1996) (decision concerning child custody should be upheld if supported by substantial reasoning based on a firm factual foundation in the record).[16]

The order from which this appeal is taken is therefore

*Affirmed.*[17]

---

14. In fact, Dr. Galbis essentially admits that his conduct was willful by claiming, for the first time on appeal, that he did not comply with the discovery requests because the information requested was too voluminous.

15. The location of a vodka bottle allegedly filled with water (there was no proof that it was actually vodka) and the presence of some rust on an operative seat belt strike us as relatively minor examples of "poor judgment," especially when Dr. Nadal agreed to let her son travel in the car. Although we must defer to the trial court's finding as to Dr. Galbis' failure to consult Dr. Nadal about the Ritalin dosage, we note that Dr. Galbis is himself a physician and that he has levied some counter-accusations against Dr. Nadal with respect to the proper treatment of Ricardo José. At this stage in the proceedings, we cannot resolve those disagreements between

the parties. Instead, viewing the entire record in the light most favorable to Dr. Nadal, as we must, we cannot say that the court abused its discretion.

16. Dr. Galbis' position on the issue of travel to Cuba is further weakened by the court's failure to preclude all possibility of a trip in the future and its express encouragement of such a trip. Considering the grandmother's age (now at least ninety-five), we urge the parties to reach an agreement on travel arrangements before it is too late for Ricardo José to spend some meaningful time with his grandmother.

17. Dr. Galbis also contends that the trial court was biased against him. We find absolutely nothing in the record to support that contention.