**Ernest P. LASCHÉ, Appellant,**

v.

**Pamela Beth LEVIN, Appellee.**

**No. 07–FM–743.**

District of Columbia Court of Appeals.

Argued Jan. 29, 2009.
Decided Aug. 6, 2009.

---

Gary A. Stein, Rockville, MD, for appellant.

Kristin Henrikson, with whom Margaret J. McKinney, Bethesda, MD, was on the brief, for appellee.

Before GLICKMAN and FISHER, Associate Judges, and STEADMAN, Senior Judge.

STEADMAN, Senior Judge:

Appellant, Ernest P. Lasché, appeals the trial court's order that he pay $697 per month, beginning February 1, 2007, in current child support and $130 per month, beginning July 1, 2007, toward a judgment of $81,343 in unpaid retroactive child support dating from 1996 forward. Lasché argues that the trial court did not have the authority to award retroactive child support from as far back as 1996, and that even if the trial court had such authority, the trial court abused its discretion in rejecting his defense of laches. Lasché also argues that the trial court erred in calculating his retroactive child support payments under the presumptive statutory Guideline by (1) including certain "lump-sum" trust distributions, (2) failing to deduct fees paid on a twenty percent interest in a family-owned beach property, and (3) failing to deduct investment losses from an online business venture. Finally, Lasché argues that the trial court erred in calculating his income for the purposes of determining his current child support obligation by failing to deduct his business expenses from his earned income. We agree with Lasché's argument that the non-periodic trust distributions should not have been included in his "gross income" under the Guideline and remand for recalculation of the retroactive child support figure. In all other respects, we uphold the trial court's determinations.

## I. The Basic Facts

Lasché and appellee, Pamela Beth Levin, were married on June 11, 1993, in Milan, Italy. Their daughter was born in Italy on December 17, 1994. On or about August 16, 1995, the parties separated when Levin and the daughter returned to Washington, D.C., from Italy. Lasché returned to the Washington, D.C., area in October 1995 but did not reside with Levin or the daughter.

In January 1998, Levin filed a Complaint for Divorce, Custody, and Child Support in the District of Columbia Superior Court. Levin hired an individual to effect service on Lasché, but that individual was unsuccessful in effecting service. The Superior Court then dismissed Levin's complaint without prejudice due to her failure to effect service on Lasché. Levin again filed for divorce in the Superior Court at some point in 2002 but again was unable to effect service on Lasché. She then applied for child support services from the District's child support agency.

On his part, Lasché filed a Petition for Dissolution of Marriage before the Circuit Court in Manatee County, Florida, on September 18, 2002, and an Amended Petition

for Dissolution of Marriage on November 6, 2002. The Florida judge granted the parties' divorce but made no ruling regarding child support or visitation due to jurisdictional limitations. In September 2004, Levin re-contacted the District's child support agency, which filed an interstate support action on Levin's behalf. The child support agency was unable to locate Lasché.

On April 12, 2006, Lasché filed a complaint for custody and access to his minor daughter in the District of Columbia Superior Court. On May 15, 2006, Levin filed her answer to the complaint and her counterclaim for custody and child support. Lasché filed an answer to the counterclaim for custody, noting that he was not seeking physical custody of the minor child. The trial court held a *pendente lite* hearing on November 2, 2006, and issued a temporary child support order on December 7, 2006.[1] The trial court held a hearing on retroactive child support on January 23 and 24, 2007, and issued its order on June 5, 2007.

In its final order, the trial court calculated Lasché's prospective child support obligation as $697 per month based on an estimated income of $41,290 per year. The trial court based this estimation on Lasché's bank deposits for the first five months of 2006, annualized for the full year.[2] In addition, the trial court ordered Lasché to pay $81,343 in retroactive support payments covering the period from January 1996 to December 2006, to be paid at a rate of $130 per month, as well as $12,434 for Levin's attorney fees. Prior to the trial court's order for retroactive support payments, Lasché's only payments to Levin for the care of their child since 1996 were three payments of $150 in September, October, and November 2006, as well as a single payment of $985 in December 2006.

## II. The Retroactive Child Support Award

■ We first address Lasché's challenges to the trial court's award of retroactive child support payments. "The trial court has broad discretion in making child support decisions. Absent a showing of abuse of that discretion, such decisions, both under the statutory guideline and independent of the guideline, will not be disturbed on appeal." *Galbis v. Nadal*, 734 A.2d 1094, 1100 (D.C.1999). *See also, e.g., Slaughter v. Slaughter*, 867 A.2d 976, 977 (D.C.2005).

### A. Retroactivity Vel Non

The trial court ordered that Lasché pay $130 per month beginning on July 1, 2007, for a total of $81,343 in retroactive child support payments for the period from January 1996 to December 2006. Lasché argues that the trial court erred in awarding retroactive child support from 1996. He claims that there is "no legal authority for an award of child support against a former spouse and acknowledged father of a child that is retroactive to a date ten years prior to the date child support came to be at issue." The more appropriate inquiry, however, is whether there is any legal authority preventing the trial court, in the

---

1. In its Order of Support, the trial court ordered Lasché to pay $985 per month in *pendente lite* child support based on its finding that Lasché had a total income of $68,815: $56,815 in trust income and $12,000 in earned income from self-employment.

2. In addition, the trial court noted that "[Lasché] is a highly educated person, with a Bachelor of Arts degree and a Masters Degree from Yale University in Public and private Administration."

exercise of its discretion, from making such an award.

The Child Support Guideline in effect at the time this matter came before the trial court for a final hearing contained no statute of limitations on retroactive support. *See* D.C.Code § 16–916.01 (2006 Supp.). Nor was the trial court precluded from ordering retroactive support based on our case law addressing retroactivity. Lasché argues that *Lewis v. Lewis* controls and the trial court is limited to awarding retroactive child support to "the date of the filing of the complaint," as was done in that case. 708 A.2d 249, 253–54 (D.C. 1998). Contrary to Lasché's contention, however, nothing in *Lewis* would have precluded an award of retroactive child support to a date earlier than the date of the filing of the complaint. In fact, in one case we expressly allowed retroactive child support payments to a date preceding the date of the filing of a complaint. *See J.A.W. v. D.M.E.*, 591 A.2d 844, 847–49 (D.C.1991) (ordering retroactive support to the date of the birth of the child where mother filed petition ten days after birth of the child and where paternity was at issue).

■ Lasché draws our attention to the amendments to the Child Support Guideline that went into effect on April 1, 2007, which in general impose a twenty-four month limitation on the award of retroactive child support. Child Support Guideline Revision Act of 2006, D.C. Sess. Law Serv. (West) (codified as amended at D.C.Code § 16–916.01 (2009 Supp.)).[3] Neither before the trial court[4] nor in any direct and concrete way before us[5] does Lasché assert that this amendment applies to the retroactive child support payments involved here.[6] Therefore, we do not address that question. We do note, however, that the amendment itself, unlike typical statutes of limitation, does not create an absolute two-year bar. Quite to the contrary, the amendment contains specific language permitting a trial court to award child support retroactively for a greater period where "the parent to whom support is owed proves that the parent with a legal duty to pay support has acted in bad faith or there are other extraordinary circumstances...." D.C.Code § 16–

**3.** Subsection (v)(1) of the amended Guideline provides:

> When a case is brought to establish child support, the judicial officer may award retroactive child support for a period not to exceed the 24 months preceding the filing of the petition or request for child support, unless the parent to whom support is owed proves that the parent with a legal duty to pay support has acted in bad faith or there are other extraordinary circumstances warranting an award of retroactive child support beyond the 24–month period. Upon this showing, the judicial officer may award retroactive child support for a period that exceeds the 24 months prior to the filing of the petition or request for child support. The judicial officer shall issue written factual findings stating the reason for awarding retroactive child support beyond the 24 month period.

D.C.Code § 16–916.01.

**4.** *See Hessey v. Burden*, 615 A.2d 562, 581 (D.C.1992) ("This court, and appellate courts generally, consistently refuse to consider arguments made for the first time on appeal.")

**5.** *See McCrimmon v. United States*, 853 A.2d 154, 159 n. 8 (D.C.2004) (considering arguments not made in briefs on appeal to be abandoned).

**6.** Lasché simply asserts that "the [Guideline Revision Act] was considered and passed during the life of this child support dispute and demonstrates the legislature's contemporaneous intent on the subject of retroactive child support." Nor does Lasché argue that the general three-year statute of limitations "for which a limitation is not otherwise specially prescribed" applies. *See* D.C.Code § 12–301(8) (2009 Supp.).

916.01(v)(1).[7]

■ In addition, the apparent legislative purpose behind the amendment does not particularly apply to the situation before us. The Final Recommendations of the Child Support Guideline Commission note that "unlimited retroactive support often results in uncollectible arrears, especially for low-income parents with a legal duty to pay support...." REPORT OF THE DISTRICT OF COLUMBIA CHILD SUPPORT GUIDELINE COMMISSION, FINAL RECOMMENDATIONS 27 (July 2004). The Final Recommendations also note that "uncollectible arrears can discourage payments on current support, as well as continued parental involvement." *Id.* The Committee on the Judiciary, in its favorable report on the Guideline Revision Act, recognized that "the accrual of high uncollectible arrears promotes the nonpayment of child support and chills the parental relationship between the non-custodial parent and the child." D.C. COUNCIL REPORT ON BILL 16–205 at 4 (Feb. 28, 2006). Lasché, however, is not the typical low-income parent who is unable to pay retroactive support. Rather, as discussed *infra*, he is a highly educated individual who has pursued a number of low-paying professions and risky business ventures, as well as one who has received six-figure payments from family wealth. *See* D.C.Code § 16–916.01(d)(10) (2009 Supp.) (allowing a judicial officer to impute in-

come to a parent who is voluntarily underemployed). Moreover, the trial court made provision that the retroactive child support be paid out in relatively small monthly payments over an extended period of time, at a rate such that Lasché will not pay off the balance for approximately fifty-two years.[8] Thus, on a discounted basis, the total amount of the retroactive child support is far less than the dollar figure itself. Even if the statute were to apply, it might quite possibly be within the trial court's discretion to make the same award that it did here.

■ Even absent statutory. or case limitation on retroactivity, Lasché argues that the trial court erred in rejecting his defense of laches. The determination on applicability of a laches defense is a mixed question of law and fact. *American Univ. Park Citizens Ass'n v. Burka,* 400 A.2d 737, 741 (D.C.1979) (internal citations omitted). We will review the trial court's factual determinations for clear error, and we will review whether those facts are sufficient to sustain the defense *de novo. Id.* (holding that we "will review without need for deference to the trial court's judgment" the applicability of a laches defense). For a successful defense of laches, the trial court must find "an undue and unexplained delay on the part of one party which works an injustice to the other party." *Amidon v. Amidon,* 280 A.2d 82, 84

7. In fact, both the former Guideline and the amended Guideline permit judicial discretion in deviation from the Child Support Guideline generally. *See* D.C.Code § 16–916.01(p) (2009 Supp.) *formerly* D.C.Code § 16–916.01(*l*) (2006 Supp.) ("Application of the guideline shall be presumptive."); *In re X.B.,* 637 A.2d 1144, 1150 (D.C.1994) ("[D]epartures from the Guideline are authorized if its application would be unjust or inappropriate under the circumstances shown.") (internal citation omitted); *Robinson v. Robinson,* 629 A.2d 562, 564 (D.C.1993) ("[A] judicial officer entering a support order may depart from the

guideline in exceptional circumstances if the reasons for not applying the guideline are explained in writing.").

8. We note that there is no limitation on an order of retroactive child support to be paid beyond the twenty-first birthday of the child. *See Wagley v. Evans,* 971 A.2d 205, 209 (D.C. 2009) ("[T]he court's jurisdiction to enforce a support order is a continuing one, and emancipation of the child should not serve to dilute the court's authority to enforce arrearages that accrued before emancipation.").

(D.C.1971) (internal citations omitted). "One factor to be considered by the court in determining whether laches is applicable in a given case is whether the defendant may have changed [his] position in a manner that would not have occurred but for plaintiff's delay." *Kerrigan v. Kerrigan*, 642 A.2d 1324, 1326 (D.C.1994) (internal citation and quotation marks omitted). Another factor is the parent's current financial condition. *Padgett v. Padgett*, 472 A.2d 849, 853 (D.C.1984). The party asserting the defense has the burden of establishing these elements. *American Univ. Park, supra*, 400 A.2d at 740.[9]

Lasché has not satisfied his burden here. The trial court found no undue or unexplained delay by Levin:

> [Levin] sought at least three times since the parties separated to sue [Lasché] for child support. Each time she was unable to service [Lasché]. In addition, for most of the ten-year period from January 1996 to the filing of this action, the exact whereabouts of [Lasché] was unknown to [Levin]. In general, [Lasché] could only be reached through a post office box.

On the record here, we cannot fault the trial court's conclusion that Levin's delay was neither undue or unexplained, but rather resulted from understandable difficulties locating Lasché. Unlike *Padgett, supra*, cited by Lasché, where the appellant made no attempt to file a writ of attachment for child support for nine years, Levin made numerous unsuccessful attempts to obtain child support from Lasché. 472 A.2d at 852. She attempted in 1998, 2002, and 2004 to obtain child support from Lasché but was unable to effect service. In her first attempt to

effect service, Levin hired another individual to complete the task. She also applied for child support services from the District's child support agency on two occasions—in 2002 and 2004. Neither of these parties was able to locate Lasché, even after the District's child support agency filed an interstate support action on Levin's behalf.

With respect to prejudice, Lasché claims that he suffered an injustice because he spent more than $105,000 of his trust inheritance on his previously existing debts because he did not know that he would be accountable for an arrearage judgment in excess of $80,000. Nonetheless, as noted by Levin, "Mr. Lasché knew he had a child. Mr. Lasché knew he was not helping to financially support his child. Mr. Lasché knew where the mother and child lived and was in contact with them." The enforcement of his continuing obligation to support his daughter hardly came as a bolt from the blue.

### B. Award Calculation

Levin's counsel filed and the trial court adopted a Child Support Information Sheet, which demonstrated how Levin calculated the amount of retroactive child support owed by Lasché under the Guideline. The trial court concluded that the facts and information contained in the Information Sheet were supported by a preponderance of the evidence and that the calculations contained therein were accurate. The trial court then awarded "[t]he total of the guideline amount of support from January 1996 to December [2]006," minus "[t]he total amount of child support paid by [Lasché] over the ten-year period." Lasché challenges the computation in

---

9. We note that the rights of the child may be a consideration in determining the applicability of a laches defense to payments of child support. *See Burnette v. Void*, 509 A.2d 606, 608 (D.C.1986) (holding that a custodial parent's unclean hands do not bar that parent from seeking an increase in child support).

three respects. We reject two of the challenges, but are of the view that his challenge to the treatment of his receipt of non-periodic trust distributions is justified.

1. *The Trust Distributions:* In August 2005, Lasché received a one-time distribution of $159,601 from his father's trust, the "Revocable Living Trust Agreement of Ernest P. Lasché, II," and in August 2006, Lasché received a distribution of $56,815 from his mother's trust, the "Revocable Living Trust Agreement of Georgia B. Lasché." [10] An additional distribution from the trust of Georgia B. Lasché was anticipated in 2007 to distribute the balance of the funds in this trust. The trial judge included Lasché's two distributions from his parents' trusts in his determination of Lasché's child support payments. The hypothetical second disbursement from the trust of Georgia B. Lasché was not included in the trial court's determination of Lasché's child support payments and we do not know whether Lasché received this disbursement at any point in 2007 or thereafter. The trial court stated during the parties' *pendente lite* hearing that "[t]here's no difference between that one lump sum inheritance and one lump sum lottery."

■■■ Whether distributions from the termination of a trust constitute "gross income" for the purposes of determining child support payments is an issue of first impression before this court. D.C.Code § 16–916.01(d)(1)(O) (2009 Supp.) *formerly* D.C.Code § 16–916.01(c)(15) (2006 Supp.), does include "[i]ncome from a trust" as part of an individual's gross income for purposes of calculating child support. The issue is whether that phrase includes any and all distributions from a trust, even those that come from the trust principal in termination of the trust. We conclude, in conformity with the District's statutory scheme and interpretation of similar provisions from other jurisdictions, that the phrase cannot be so broadly read.

By their structure, trusts of the type involved here will typically consist of a trust corpus or principal, which is invested in income-producing investments of various kinds and will provide for payouts of such income on a regular basis to one or more trust beneficiaries.[11] On its face, the provision dealing with "income from a trust" could plausibly be read as applying only to payouts that come from "income" to the trust itself, and that would be the end of the inquiry. But it may also be appropriate to approach the question from the perspective of the recipient, and the issue therefore justifies further exploration.

In the distinction between income and principal, trust income does not differ from

---

**10.** Apparently, these distributions were made from the trust corpus as a result of the termination of the inter vivos trusts upon the trustors' respective deaths. According to Lasché, he used a part of these distributions to pay off $80,000 in pre-existing consumer debt, $10,000 in car loans, and $15,000 in legal fees, as well as on a trip to visit his aunt, living expenses, and to pursue a number of business ventures, including a biodiesel business.

**11.** This is not to say that the distinction between principal and income in the trust context, as in others, cannot be a difficult and debatable determination. *See* Uniform Principal and Income Act, D.C.Code §§ 28–4801.01 to –4806.02 (2009 Supp.). Moreover, provisions of trusts dealing with payouts can vary considerably. A not uncommon provision allows for payouts from a trust corpus for various purposes, such as for college education or to meet the needs of beneficiaries for whom income payouts are insufficient. And a final distribution upon termination of a trust may include accrued income not yet distributed. We do not address here such refinements, all of which may be considered by a trial court where applicable.

other examples of investments provided for in the Guideline, which include "[i]nterest or dividends," D.C.Code § 16–916.01(d)(1)(F) (2009 Supp.) *formerly* D.C.Code § 16–916.01(c)(6) (2006 Supp.), but, in the case of investment capital, the payouts, if to be included in gross income, must be made on a regular basis so as to be the equivalent of income payouts. Specifically, capital gains from a real or personal property transaction are included in gross income only if "the capital gains represent a regular source of income." *Id.* at § 16–916.01(d)(1)(P) (2009 Supp.) *formerly* § 16–916.01(c)(16) (2006 Supp.). In the same vein, only "[a] contract that results in regular income," *id.* at § 16–916.01(d)(1)(Q) (2009 Supp.) *formerly* § 16–916.01(c)(18) (2006 Supp.), is included in gross income. The concept of regular income is also seen in the provision relating to "[a] perquisite or in-kind compensation," which is included in gross income only if it "represents a regular source of income or reduces living expenses." *Id.* at § 16–916.01(d)(1)(R) (2009 Supp.) *formerly* § 16–916.01(c)(19) (2006 Supp.). Finally, and most importantly, in the provision most closely related to that dealing with "income from a trust," the Guideline provides that only "[r]egular income from an interest in an estate, directly or through a trust," is included in gross income. *Id.* at § 16–916.01(d)(1)(T) (2009 Supp.) *formerly* § 16–916.01(c)(21) (2006 Supp.). The

Guideline does not define "regular sources of income," but a common-sense interpretation of the term in light of the examples listed in D.C.Code § 16–916.01 suggests that regular income cannot reasonably include non-periodic disbursements from a trust corpus.[12] In short, the overall structure of the examples of gross income in the statute appears to exclude transactions involving shifts in and movements of capital as opposed to income.

To support the proposition that an inheritance from an estate or trust is not income for purposes of calculating child support, Lasché cites a 2002 case from the Supreme Court of Pennsylvania that we find persuasive. In *Humphreys v. DeRoss*, 567 Pa. 614, 790 A.2d 281, 284–85 (2002), the Supreme Court of Pennsylvania held that an inheritance did not constitute income for purposes of determining child support because an inheritance was not "income" as defined in the Pennsylvania Domestic Relations Code. 23 PA. CONS.STAT. ANN. § 4302 (West 2009) (defining "income" to include "income in respect of a decedent," "income from an interest in an estate or trust," or "other entitlements to money or lump sum awards, without regard to source, including lottery winnings").[13] The Supreme Court of Pennsylvania concluded, "In light of the fact that the legislature specifically included 'income from an estate or trust' but did not include the principal of an inheritance or trust, it

---

12. The only one-time payments included within the examples of "gross income" are, as noted by the trial court, "[l]ottery or gambling winnings that are received in a lump sum or in an annuity," or prizes and awards. *Id.* at § 16–916.01(d)(1)(U), (V) (2009 Supp.) *formerly* § 16–916.01(c)(22), (23) (2006 Supp.). Such events, however, may in the normal course not be considered as infusions of capital, to be treated as such and reinvested for their income potential. We note in that regard that lottery winnings are expected at times to be received in "an annuity," ordinarily an income concept. The contrary is

the normal case with capital gains and corpus distributions from decedents' estates and trusts, as indicated by their treatment in the Guideline.

13. The District's Child Support Guideline similarly includes "[i]ncome from a trust" and "[r]egular income from an interest in an estate, directly or though a trust" as "gross income." D.C.Code § 16–916.01(d)(1)(O), (T) (2009 Supp.) *formerly* D.C.Code § 16–916.01(c)(15), (21) (2006 Supp.).

is logical to assume that the legislature did not intend to include the principal." *Id.* at 285 (internal citations omitted). Similar logic applies here.

The Supreme Court of Pennsylvania in *Humphreys, supra,* 790 A.2d at 286–87, cited a number of cases from other jurisdictions to support the conclusion that although income generated from an inheritance is relevant to child support calculations, inheritances per se do not constitute income for purposes of calculating child support. *See Robinson v. Robinson,* 961 P.2d 1000, 1003 n. 3 (Alaska 1998) ("If on remand the superior court determines that this property was indeed inherited, only the interest from its sale and capital gain, if any, calculated on the property's basis as inherited property, would qualify as income"); *Connell v. Connell,* 313 N.J.Super. 426, 712 A.2d 1266, 1269 (App.Div.1998) ("[T]he inheritance and its capacity to produce income may be considered when computing child support."); *Gainey v. Gainey,* 89 Wash. App. 269, 948 P.2d 865, 869 (1997) ("[T]he corpus of an inheritance is not included in a parent's gross income, but ... the interest generated by an inheritance is."); *Gal v. Gal,* 937 S.W.2d 391, 393 (Mo.Ct.App.1997) (reviewing trial court's calculation of child support obligation that included income generated from an inheritance). We have found additional support for this conclusion.

*See Nass v. Seaton,* 904 P.2d 412, 416 (Alaska 1995) (concluding that "any other approach blurs the easily administered and well-established historical distinction between gifts and earned income."); *County of Kern v. Castle,* 75 Cal.App.4th 1442, 89 Cal.Rptr.2d 874, 882 (1999) (holding, "(1) one-time gifts or inheritances are not income; (2) interest, rents, dividends, etc., which are actually earned from gifts or inheritances, are income for purposes of child support; and (3) imputation of income based on the inheritance corpus or on interest the sum could have earned if invested, may be considered income in calculating support in the court's discretion.").[14]

 This is not to say, however, that the altered financial state of the parent is not an appropriate factor to be taken into account. As set forth above, see *supra* note 7, trial courts have discretion to deviate from the Guideline and imputed income from the distribution is a relevant factor if the parent chooses to deal with the distribution other than as an investment vehicle. *See Croak v. Bergeron,* 67 Mass.App.Ct. 750, 856 N.E.2d 900, 906 (2006) (noting that "[a] consideration of resources would seem particularly appropriate" where a parent uses assets "to support himself (and for other purposes beneficial to him) during ... his orchestrated periods of unemployment"); *Gardner, supra* note 14, 743 N.E.2d at 359

14. Those jurisdictions that have concluded that inheritances constitute income are working under a statutory scheme with a much broader definition of income. *See, e.g., In re A.M.D.,* 78 P.3d 741, 745 (Colo.2003) (holding that "a monetary inheritance may be included in gross income for purposes of calculating child support" based on a statutory scheme that expressly includes gifts in its definition of gross income for purposes of child support); *Ford v. Ford,* 347 Ark. 485, 65 S.W.3d 432, 439 (2002) (noting that the relevant definition of income included "any form of payment,

periodic or otherwise" in concluding that gift and one-time retirement payment constituted income for purposes of child support calculation); *Gardner v. Yrttima,* 743 N.E.2d 353, 358 (Ind.Ct.App.2001) (concluding "an inheritance should be considered in determining gross income" where gifts are included in the statutory provision addressing gross income); *Goldhamer v. Cohen,* 31 Va.App. 728, 525 S.E.2d 599, 603 (2000) (including inheritances as gross income in calculation of child support obligation based on the statutory inclusion of gifts).

(concluding that "if a parent places the inheritance in non-income producing assets, a trial court may also consider the inheritance in determining whether income should be imputed to the parent for purposes of child support."). The trial court retains that discretion in part because "[a] parent cannot insulate an inheritance from consideration for child support by transforming it into a non-income producing asset." *Cody v. Evans–Cody,* 291 A.D.2d 27, 735 N.Y.S.2d 181, 185 (2001).

In light of the District's statutory scheme, as well as case law from other jurisdictions with similar statutory schemes, Lasché's non-periodic distributions from the trusts were not in themselves "gross income" within the meaning of the Guideline. We hold simply the trial court erred in including Lasché's trust disbursements per se in its calculation of Lasché's retroactive child support obligation. Given the limited record before us and the discretionary nature of the decision, we leave for further determination by the trial court upon remand how the trust distributions should be treated in light of the particular facts of this case.

 2. *The Beach Home:* Through his parents, Lasché and his four siblings each inherited a twenty percent share in a beach house in Florida, held as Lasché Beach House, LLC. Lasché argues that the trial court abused its discretion when it failed to deduct his payments in real estate taxes, insurance, and maintenance on his family's beach house as reasonable and necessary business expenses from a business or partnership. *See* D.C.Code § 16–916.01(d)(1)(G) (2009 Supp.) *formerly* D.C.Code § 16–916.01(c)(7) (2006 Supp.). Levin argues, on the other hand, that

"[t]here being no income from the partnership, there is no basis to deduct any expenses associated with the same."

The basic fallacy with Lasché's argument is that the property is not being devoted to income-producing purposes and thus is not a business in any meaningful sense of the word. Lasché claims that he was prevented from renting the house to generate income by his family members' co-ownership interest in the property, but he fails to show that he could not eliminate the obligation of covering such expenses by disposing of his interest in the property. The trial court did not abuse its discretion in refusing to deduct payments in real estate taxes, insurance, and maintenance on the beach house.

 3. *Business Losses:* The trial court, in adopting Levin's Child Support Information Sheet, also did not deduct losses from his online business venture from 1998 to 2001.[15] Lasché argues that the trial court failed to deduct his out-of-pocket expenses under D.C.Code § 16–916.01(d)(1)(G) (2009 Supp.),[16] all of which he claims are reflected on his tax returns admitted into evidence. He further argues that "[t]here was no evidence presented that the expenses he incurred regarding the losses were not reasonable and necessary."

We need not decide whether losses on a business that never generates income can properly be deducted from the trial court's calculation of a parent's gross income because Lasché failed to satisfy his burden to provide evidence showing that these business expenses were reasonable and necessary. *See* D.C.Code § 16–916.01(d)(11)

---

**15.** The claimed losses at issue total $2,465: $433 in 1998, $25 in 1999, $1,680 in 2000, and $327 in 2001.

**16.** "Income derived from a business or partnership after deduction of reasonable and necessary business expenses, but not depreciation[.]"

(2009 Supp.) ("The judicial officer shall determine the adjusted gross income of each parent based on evidence, including pay stubs, tax returns, employer statements, affidavits, and oral testimony provided under oath."); *see also Wagley, supra* note 8, 971 A.2d at 213 (concluding that trial court did not err in declining to credit father with contributions allegedly made to children's education where father provided no "proof of the payments or their source."); *Hight v. Tucker,* 757 A.2d 756, 759 (D.C.2000) (remanding where husband presented no documentation of total amount of expenses paid for care of wife or how they impaired his ability to meet child support obligation). Given Lasché's statements that he could not "speak with specifics about where the losses come from" and that the losses were "paper" losses from a business that "was all in hopes of future equity," the trial court did not abuse its discretion in refusing to deduct investment losses of Lasché's online business venture.

## III. Current Child Support Payments

 In calculating Lasché's initial current monthly payment for child support beginning in February 2007, the trial court looked principally to the year 2006. The court annualized Lasché's bank deposits for the first five months of 2006 and took note that Lasché is a "highly educated person" with both a Bachelor of Arts Degree and a Masters Degree from Yale University. Lasché's sole objection is that the trial court erred in calculating his income for the purposes of this initial monthly child support payment by failing to deduct his ordinary and necessary business expenses from his gross earnings as a sea captain. However, as with the similar claimed error in the calculation of past-due child support, the trial court's failure to deduct Lasché's 2006 business expenses was not an abuse of discretion because Lasché provided no evidence of his expenses for 2006, which was the critical year in question. When asked during the hearing whether he had any figures regarding his 2006 income, Lasché replied, "Ma'am, I rely on the instructions from counsel. I was not specifically instructed to do that, so I did not."

 Although Lasché's tax returns provide figures for his expenses in previous years, Lasché had worked as a computer consultant,[17] administrator, timber manager, carpenter, and sea captain since his return from Italy, and has earned a gross income ranging from $6,987 in 1996 to $13,985 in 2005. His monthly expenses during this time ranged from $3,477 to $7,539. Although the Child Support Guideline expressly calls for the "deduction of reasonable and necessary business expenses," the burden to produce evidence of those reasonable and necessary business expenses must rest with the party seeking to deduct them because that party is uniquely situated to produce evidence of these expenses. *See Wagley, supra* note 8, 971 A.2d at 213 (concluding that trial court did not err in declining to credit an appellant with contributions allegedly made to children's education where the appellant provided no "proof of the payments or their source").

Here, not only did Lasché's profession and salary change on a regular basis, thereby preventing the court from accurately estimating his reasonable business expenses, but Lasché also failed to provide any evidence of his reasonable business expenses upon which the trial court could have relied. *See* D.C.Code § 16–

---

**17.** Lasché had participated in the start-up of a computer services company: PanHandle On-Line.

916.01(d)(11) (2009 Supp.) ("The judicial officer shall determine the adjusted gross income of each parent based on evidence, including pay stubs, tax returns, employer statements, affidavits, and oral testimony provided under oath."); *Hight, supra,* 757 A.2d at 759 (concluding that evidence was insufficient to support reduction of child support payment where father testified that his wife was ill and that he incurred expenses related to her illness but presented no documentation to this effect and did not state the total amount of those expenses or how they impaired his ability to meet his child support obligation). As such, the trial court had no means to determine Lasché's expenses for 2006 and in no way abused its discretion in declining to deduct them.[18]

In support of its award of child support, the trial court also noted Lasché's earning potential. As stated by the trial court, "[Lasché] is a highly educated person, with a Bachelor of Arts degree and a Masters Degree from Yale University in Public and private Administration." Although child support orders should not be punitive, *see Mims v. Mims,* 635 A.2d 320, 323 (D.C. 1993) ("Child support is not intended to punish the father, but rather to ensure a decent standard of living for the child."), we have consistently held that a parent may not purposefully curtail his or her earning capacity to reduce child support payments. *See, e.g., Lewis, supra,* 637

A.2d at 73 (*"Voluntary* reduction of income or self-imposed curtailment of earning capacity ordinarily does not affect the spouse's obligation to pay."); *Freeman v. Freeman,* 397 A.2d 554, 556 (D.C.1979) ("[I]t is well established that a parent subject to a court order to support children cannot escape that duty by voluntarily reducing his or her income ... by a self-imposed curtailment of earning capacity").[19]

Because Lasché failed to provide any evidence of his business expenses for 2006, and because the trial court properly relied on Lasché's earning potential, the trial court did not abuse its discretion in determining Lasché's current child support payments.

### IV. Conclusion

We remand to the trial court to recalculate Lasché's retroactive child support obligation because the trial court improperly included two non-periodic trust disbursements as per se "gross income" for Guideline calculation purposes. In all other respects the order appealed from is affirmed.

*So ordered.*

---

18. Lasché's reliance on *Galbis, supra,* is misplaced. 734 A.2d at 1094. Lasché argues that *Galbis* is the only case in which we have affirmed a trial court's failure to deduct necessary business expenses, and that we did so only as a sanction against the parent for failure to comply with discovery orders under Super. Ct. Dom. Rel. R. 37(b). *Id.* at 1101–02. As noted in the discussion above, a court is under no duty to deduct business expenses for which there is no evidence of the appropriate amount to deduct.

19. In addition, the amended Child Support Guideline expressly permits a judge to impute income to a parent who is "voluntarily unemployed or underemployed as a result of the parent's bad faith or deliberate effort to suppress income, to avoid or minimize the parent's child support obligation, or to maximize the other parent's obligation...." D.C.Code § 16–916.01(d)(10) (2009 Supp.). The judge may then calculate the child support obligation based on the income imputed to the parent who is voluntarily unemployed or underemployed. *Id.*